# Exhibit 1

***EFILED***
Case Number 2026LA001065
Date: 7/21/2026 3:24 PM
Patrick McRae
Clerk of Circuit Court
Third Judicial Circuit, Madison County Illinois

**IN THE CIRCUIT COURT
OF MADISON COUNTY, ILLINOIS**

| | | |
|---|---|---|
| ALVIN BICK,<br>DANIEL FORD, AND<br>STEVEN STRADER,<br><br>Plaintiffs,<br><br>v.<br><br>R.J. REYNOLDS TOBACCO COMPANY,<br>a North Carolina for-profit corporation;<br>PHILIP MORRIS USA, INC.,<br>a Virginia for-profit corporation;<br>and WALGREEN CO.,<br>an Illinois corporation.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 2026LA001065<br><br>**JURY DEMANDED** |

**COMPLAINT AT LAW**

Plaintiffs, by and through counsel, TorHoerman Law, LLC, file this Complaint against Defendants R.J. Reynolds Tobacco Company (R.J. Reynolds), Philip Morris USA, Inc. (Philip Morris), and Walgreen Co. (Walgreens), and allege as follows:

***Parties & Jurisdiction***

1. At all times material Plaintiffs Alvin Bick, Daniel Ford and Steven Strader were citizens of Illinois. Plaintiffs smoked cigarette products designed, manufactured, advertised, marketed, distributed and/or sold by the Defendants, including but not limited to R.J. Reynolds and Philip Morris cigarette products designed, manufactured, advertised, marketed, distributed and/or sold by defendants R.J. Reynolds. Philip Morris, and Walgreens. Further, Plaintiffs all

became addicted as children to nicotine in cigarette smoke, which altered, changed and damaged their developing brain to create a strong and permanent addiction to nicotine.

2. Defendant R.J. Reynolds Tobacco Company ("R.J. Reynolds") is a North Carolina for-profit corporation with its principal place of business in North Carolina. At all relevant times, R.J. Reynolds was authorized to do business in Illinois, registered to do business in Illinois, maintained a registered agent for service of process in Illinois, and purposefully conducted substantial business in Illinois, including Madison County. R.J. Reynolds designed, manufactured, advertised, marketed, promoted, distributed, and/or sold R.J. Reynolds-brand cigarette products, including brands for which R.J. Reynolds is a successor-in-interest, into the Illinois stream of commerce with the intent and expectation that those products would be purchased, used, smoked, and inhaled by Illinois consumers, including Plaintiffs. Plaintiffs' claims arise out of and relate to R.J. Reynolds' Illinois-directed conduct because Plaintiffs purchased, used, smoked, and/or were exposed in Illinois to cigarette products designed, manufactured, advertised, marketed, promoted, distributed, and/or sold by R.J. Reynolds, which caused or contributed to cause Plaintiffs' addiction, toxic cigarette-smoke exposure, illnesses, diseases, cancers, and other injuries. Service of process on R.J. Reynolds may be had through its registered agent, Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois 62703-4261, and/or through service upon an officer or agent of R.J. Reynolds located at R.J. Reynolds' principal place of business.

3. Defendant Philip Morris USA Inc. ("Philip Morris") is a Virginia for-profit corporation with its principal place of business in Virginia. At all relevant times, Philip Morris was authorized to do business in Illinois, registered to do business in Illinois, maintained a registered agent for service of process in Illinois, and purposefully conducted substantial business in Illinois, including Madison County. Philip Morris designed, manufactured, advertised, marketed, promoted, distributed, and/or sold Philip Morris-brand cigarette products into the Illinois stream of commerce with the intent and expectation that those products would be purchased, used, smoked, and inhaled by Illinois consumers, including Plaintiffs. Plaintiffs' claims arise out of and relate to Philip Morris' Illinois-directed conduct because Plaintiffs purchased, used, smoked, and/or were exposed in Illinois to cigarette products designed, manufactured, advertised, marketed, promoted, distributed, and/or sold by Philip Morris, which caused or contributed to cause Plaintiffs' addiction, toxic cigarette-smoke exposure, illnesses, diseases, cancers, and other injuries. Service of process on Philip Morris may be had through its registered agent, United Agent Group Inc., 1320 Tower Road, Schaumburg, Illinois 60173-4309, and/or through service upon an officer or agent of Philip Morris located at Philip Morris' principal place of business.

4. Defendant Walgreen Co. ("Walgreens") is an Illinois corporation with its principal place of business in Illinois. Walgreens is an Illinois citizen and, at all relevant times, conducted business in Illinois, including Madison County. Walgreens distributed, promoted, offered for sale, and/or sold cigarettes in Illinois,

including cigarettes purchased, used, smoked, and/or inhaled by Plaintiffs. Plaintiffs' claims arise out of and relate to Walgreens' Illinois conduct because Walgreens sold and distributed cigarette products in Illinois that caused or contributed to cause Plaintiffs' addiction, toxic cigarette-smoke exposure, illnesses, diseases, cancers, and other injuries. Walgreens also aided, abetted, substantially assisted, and/or participated in R.J. Reynolds' and Philip Morris' conspiracy and misrepresentations concerning the health effects and addictiveness of cigarette smoke. Service of process on Walgreens may be had through its registered agent, Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois 62703-4261, and/or through service upon an officer or agent of Walgreens located at Walgreens' principal place of business.

5. Venue is proper in Madison County because the transaction or some part of the transaction out of which Plaintiffs' causes of action arose occurred in Madison County, Illinois. Venue is also proper in Madison County because Walgreens maintains an office in Madison County and resides in Madison County for venue purposes.

6. This Court has personal jurisdiction over Defendants under Illinois law, including 735 ILCS 5/2-209(a)(1), 735 ILCS 5/2-209(a)(2), 735 ILCS 5/2-209(a)(3), and 735 ILCS 5/2-209(c), because Defendants transacted business in Illinois, committed tortious acts in Illinois, committed tortious acts outside Illinois that caused injury in Illinois, purposefully directed cigarette products and cigarette-related marketing, promotion, distribution, and sales activities into Illinois, and

because Plaintiffs' claims arise out of and relate to those Illinois-directed activities. Defendants failed to place reasonably safe products into the Illinois stream of commerce and instead designed, manufactured, advertised, marketed, distributed, promoted, and/or sold cigarette products that were defective and unreasonably dangerous when used as intended or in a reasonably foreseeable manner. Defendants' conduct included manipulating nicotine delivery, selling products containing carcinogenic and toxic substances, promoting cigarettes as ordinary consumer products despite their addictive and disease-causing properties, concealing and misrepresenting the true health risks and addictiveness of cigarettes, and participating in a decades-long course of conduct that caused or contributed to cause Plaintiffs' addiction, continued cigarette use, toxic cigarette-smoke exposure, illnesses, diseases, cancers, and other injuries. Defendants' Illinois-directed conduct supports this Court's exercise of jurisdiction over Plaintiffs' claims.

**Summary of the Claims**

7. R.J. Reynolds and Philip Morris (the "Tobacco Companies") preyed upon children. Plaintiffs are adults now, but they were addicted as children – and their brains were altered, changed, and damaged by nicotine as children. Tobacco Companies knew that over 95% of its smoking base are people who were addicted as children, with 60% smoking first before age 13. By the 1970s, Tobacco Companies internally admitted without addicting children, they would go out of business: "If our Company is to survive and prosper, over the long term we must get our share of the

youth market [aka children]." Another memo stated: "The base of our business is the high school student [aka children]."

8. Tobacco Companies addicted children by creating an America where cigarette smoke was ubiquitous. From the 1950s to the 2000s, cigarette smoke was nearly-everywhere: in workplaces, restaurants, movie theaters, sporting gymnasiums, airplanes, buses, taxi cabs, personal vehicles, and, of course, in the home. The accompanying ashtrays sat on work desks, boardrooms, kitchen tables, dining rooms, living rooms, bedside tables, airplane armrests, movie theater armrests, bus seats, car doors, and center consoles.

9. In fact, nicotine is so powerful that secondhand smoke was changing young children's brains to favor a pre-addiction to smoking, even before they ever picked up a cigarette. Many children, not even born yet, had mothers or fathers who smoked while they were in utero, piping nicotine into their growing brain. Other children grew up in smoke-filled households. A child's developing body and brain is extremely sensitive to nicotine in the secondhand smoke.

10. The Tobacco Companies internally knew nicotine was powerfully addictive, especially in developing children, changing brains:

- "We are in the business of selling nicotine, an addictive drug…"
- "Very few consumers are aware of the effects of nicotine, i.e., its addictive nature and that nicotine is a poison."
- "We can't defend continued smoking as 'free choice' if the person was 'addicted'."

11. These parents love their children. They simply believed what the vast majority of Americans believed: that cigarette smoke was not dangerous, and at worst, cigarette smoke was perhaps an annoyance like body odor or bad perfume. Tens of millions of Americans subjected their babies, their growing children, their tweens and teenagers, their spouses, their grandparents, their friends and neighbors, and others they love and cared about to substantially increased risks of cigarette-smoke related illnesses, diseases, disability, cancers, and earlier death because Americans didn't know the full and complete truth. Americans were lied to by the Tobacco Companies in one of the most sophisticated and well-executed frauds of corporate greed in human history.

12. The story of the Tobacco Companies fraud is so vast it takes multiple days to explain at trial to a jury. But in sum, the Tobacco Companies knew since the 1950s that there is no safe level of exposure to cigarette smoke; that nicotine was extremely addictive on par with heroin, and that addicting children to cigarettes was the base of their business.

13. One federal judge, Gladys Kessler, after a 9 month trial, summed up the fraud and conspiracy this way: This case " is about an industry [the Tobacco Companies] that survives, and profits, from selling a highly addictive product which causes diseases that lead to a staggering number of deaths per year, an immeasurable amount of human suffering and economic loss, and a profound burden on our national health care system. [The Tobacco Companies] have known many of these facts for at least 50 years or more. Despite that knowledge, they have consistently, repeatedly and

with enormous skill and sophistication, denied these facts to the public, the Government, and to the public health community."

14. Tobacco Companies mastered the art of using front-groups as "grassroots," using billions of dollars to keep their lies a secret, to sow distrust, doubt, and confusion with the American public, so that any person criticizing cigarette smoke would be framed as anti-freedom and an agent of a Government nanny-state.

15. If American society from the 1950s told the truth by the Tobacco Companies directly and honestly (instead of those companies spending billions of dollars over 50 years to lie), cigarette smoke would have nearly disappeared from American life by the 1960s. However, by 1972 the tobacco industry internally congratulated itself on how "brilliantly conceived and executed" was its conspiracy in an internal memo called "The Roper Proposal" where the Tobacco Companies laid out their successes in (1) creating doubt about the health charge without actually denying it; (2) advocating the public's right to smoke, without actually urging them to take up the practice; and (3) encouraging scientific research (meaning, defunding any research on cigarette smoking while funding any other research on any other possible disease causing agent). Also by the 1970s, the Tobacco Companies' law firms were instrumental in helping coordinate the hiding of continuing conspiracy, steering payments for "scientific" research, coordinating allies and fake grassroots groups, and determining strategies to continue to addict children, while keeping Americans (and children) in clouds of cigarette smoke. Again, Judge Kessler after a nine-month trial summarized the lawyers for the Tobacco Companies as aiding and abetting the conspiracy: "Lawyers

at every stage . . . played an absolutely central role in the creation and perpetuation of the Enterprise and the implementation of its fraudulent schemes." (Parenthetical added)

16. This is a story of children in the 1950s, 60s, 70s and 80s versus the smartest, richest, biggest, successful, and most powerful companies in the world: the Tobacco Companies. Children had no chance.

17. First, the Tobacco Companies knew that nicotine in its cigarettes (which the Tobacco Companies manipulate to exacting potency) actually changes, damages, and rewires the brains of children. All humans have adult higher thought process set in the frontal cortex of the brain. This area of the frontal cortex develops later, in the early 20s. However, for children exposed to nicotine through secondhand smoke or smoking cigarettes, the nicotine drug rewires their brains. The rewired brain believes that nicotine intake is normal and necessary for their development, leading to a lifelong corruption of the frontal cortex as to nicotine's addictive effects. In sum, children's brains are changed, rewired, and damaged (much like brain trauma) toward extremely high addiction to nicotine. These addicted children have the highest likelihood of becoming life-long smokers. (And these children also become the highest profit makers for the Tobacco Companies). Further, because the frontal cortex is re-wired, these childhood addicted smokers – once adults – are more susceptible to believing the propaganda of Tobacco Companies (which the vast majority of the American public believed up and until the mid-to-late-2000s only then when many public places finally went "smoke-free.")

18. From the 1950s to the early 2000s, Tobacco Companies spent billions of dollars to create a culture of skepticism, controversy and doubt as to the "health effects" of cigarette smoke. The Tobacco Companies promoted messages that nicotine was not addictive; that cigarette smoke was as harmless as human body odor or bad perfume; that +milk was more dangerous than cigarette smoke; that babies born to smoking mothers were just as healthy as babies born to nonsmoking mothers; that no disease, illness, or cancer could be statistically traced to cigarette smoke; and that nicotine was not manipulated in their cigarettes. In 1994, the heads of the seven largest tobacco companies told Congress that cigarette smoke causes no illnesses and is not addictive.

19. But more important were the front-groups that Tobacco Companies controlled. The Tobacco Companies used a vast network of agents, allies, front groups, and fake grassroots groups to state it was not omnipresent cigarette smoke, but air pollution, radon, sick-building syndrome, and genetics were causing the spike in throat and lung cancers and COPD and heart disease. For example, the Tobacco Companies controlled many independent looking groups, like the Center for Indoor Air Research, National Smokers Alliance and the Tobacco Action Network, which were total fraud proxies for the tobacco industry. Other groups, like various state Tobacco & Candy Wholesale Associations were tobacco industry controlled, along with self-reported allies to the Tobacco Companies, which included various Chambers of Commerce, Restaurant Associations, Hotel & Resort Associations, and Wholesaler Associations – all who help advance the tobacco industries' fraud that

cigarette smoke is not dangerous, or held a trivial risk of harm, like body odor or perfume, so that cigarette smoke should be a right for any person to smoke anywhere at any time.

20. Beyond the above, the Tobacco Companies spent billions buying off doctors and scientists so that medical research focused on lighthearted non-cigarette smoke issues; along with spending billions in advertising to show cigarette smoke as the personification of the famous, athletic, young, healthy, and rich. By the 1990s, the cartoon character Joe Camel was more recognizable by kindergarteners than Micky Mouse.

21. At the same time, in the 1990s, millions of Americans sat calmly and patiently (sometimes with their young children) in clouds of cigarette smoke for many hours on airplane flights, trains, buses, taxi cabs, and in their own cars, homes and workplaces. And for those Americans who complained about cigarette smoke, the Tobacco Companies rallied their co-conspirators to attack those "naysayers" as being fascist agents of a government nanny-state against the individual "FREEDOM" to smoke. Philip Morris most directly advanced this propaganda in their Magazine of the 1980s and 1990s. R.J. Reynolds ran newspapers ads in the 1980s asking for an open debate on the controversy RJR manufactured from lies. But the whole tobacco industry used the Tobacco Institute to advance its lies in the media, TV, radio, magazines, and newspapers.

22. Despite being advised by tobacco industry lawyers in 1972, the Tobacco Companies' vast conspiracy could not last forever. The Tobacco Companies

succeeded for another 30 years – beyond their wildest dreams – orchestrating nearly 50 years of fraud, resulting in trillions of dollars of extra revenues. By the 1980s and early 1990s the Tobacco Companies were so rich they were buying up food and beverage companies, as they had more cash than they could ever spend (even while providing huge paydays and bonuses to their executives and board members.)

23. Unfortunately, these profits came with tens of millions of children having their brains altered, changed, and rewired to severe lifelong addiction. The Tobacco Companies' own rat and mice studies showed nicotine as more addictive and deadly then heroin, and that many rats and mice would starve to death, opting instead for another nicotine hit. These children grew up with cigarette smoke being a normal part of everyday life, available and found everywhere in society, and easily believing the propaganda that the Tobacco Companies weaved into society through their trade-groups, secret agents, straw-men, grass-roots groups, doctors, scientists, sports stars and celebrities, that cigarette smoke is not harmful (or carried a minimal or de minimus risk of harm).

24. This was a lie, and the Tobacco Companies knew it from the very beginning in the 1950s. Had the Tobacco Companies told the truth, tens of millions of children would not have been pawns in their game. Over 25 million people would have lived longer and healthier lives. Mothers and fathers, aunts and uncles, and grandparents would have lived longer to spend time with children and grandchildren, instead of being cut-down by cigarette smoke diseases and cancers, including COPD,

emphysema, heart disease, heart attacks, strokes, vascular dementia, leukemia, and the dozens of horrible cancers caused by toxins in cigarette smoke.

25. Further, the Tobacco Companies still have not admitted the truth and continue to defraud the public as to:

a. That there is no safe level of exposure to cigarette smoke. And that any smoke around someone else (or even the leftover toxic smoke ash and residue) increased the risk of disease and cancer.

b. Cigarette filters do not work and actually increase the risk of disease and cancer.

c. That Tobacco Companies manipulate nicotine and the P.H. of their cigarettes.

d. That Tobacco Companies' base of business is still children (those under 18 and 21 whose frontal cortex is not fully formed)

e. That vaping is the next phase of addicting children to maximize profits.

26. This lawsuit is not about the past but the future. Big businesses only speak in the language of money. And when businesses see Tobacco Companies and how lying created hundreds of billions of dollars of extra profit (and lucrative corporate salaries and bonuses) but not an equal payment for wrongdoing to children and those addicted and sickened; there is an incentive for this corporate conduct to happen again to another generation of children.

27. Plaintiffs bring this case because full compensation for all wrongs caused is the only effective deterrent to force corporations to keep the safety and welfare of people in society, particularly children, paramount and sacrosanct.

**Summary of Plaintiffs' Allegations**

28. Plaintiffs all grew up as infants, developing children, and growing teenagers when cigarette smoke was ubiquitous in the home, dinner table, family room, family car, restaurants (including child-friendly restaurants like McDonalds, Burger King, Dairy Queen), movie theaters, sports arenas, basketball gymnasiums, skating rinks, hockey rinks, buses, trains, airplanes, etc., exposing Plaintiffs to massive doses of toxic cigarette smoke (and nicotine) in their developing body and brain as children. Cigarette smoke and its toxins were unavoidable and everywhere.

29. Each Plaintiff purchased cigarettes from Walgreens.

30. Like 95% of how all smokers start, Plaintiffs all began smoking cigarettes as children, with over 70% of smokers starting before age 14.

31. Due to copious amounts of toxic cigarette smoke inhalation as developing children, all Plaintiffs had the frontal cortex of their brains altered, changed, and irreversibly damaged to be pre-conditioned to nicotine addiction. They developed severe nicotine addiction due to cigarette smoke damage as children.

32. Plaintiffs smoked and were addicted to R.J. Reynolds' and Philip Morris' brand cigarettes for decades until Plaintiffs were, after great difficulty, able to finally and successfully cease smoking cigarette products.

33. Unfortunately, after a latency period, Plaintiffs were all diagnosed with illnesses, diseases, and/or cancers for which cigarette smoke toxins were substantial contributing factors, and which were caused or contributed to cause by the cigarettes designed, manufactured, advertised, marketed, distributed, and/or sold by Defendants.

34. Plaintiff Alvin Bick resides in Montgomery County, Illinois, ingested cigarette smoke from Defendants' cigarette products in multiple counties, including Madison County, Illinois, and purchased Defendants' cigarette products in multiple counties, including, Madison County, Illinois. Alvin Bick worked in Madison County from 1973 to 2015, including at Benjamins, Don and Pennys, The Wedge, and Sunset Hills Country Club.

35. Plaintiff Alvin Bick was born in 1957.

36. Plaintiff Alvin Bick's parents, family members, friends, teachers, mentors, neighbors all smoked cigarettes, and cigarette smoke was all around Plaintiff Alvin Bick growing up and into adult life. Plaintiff Alvin Bick's family members and close friends and neighbors smoked R.J. Reynolds and Philip Morris brand cigarette products.

37. Secondhand smoke created in Plaintiff Alvin Bick's growing and developing body and brain as a child a psychological pre-addiction to cigarette smoke, along with embedding cigarette smoke toxins into Plaintiff Alvin Bick's body at a young and developing age.

38. As a child, cigarette butts, cigarette packs, loose cigarettes, and cigarette vending machines (along with ashtrays and cigarette match boxes) were always around and available at Plaintiff Alvin Bick's home, friends' homes, or in car-doors, bus-seats, or airplane seat ashtrays.

39. Plaintiff Alvin Bick had extensive secondhand smoke exposure, which was multiple times more powerful than exposure to grown adults due to the Plaintiff's developing and growing child body which created a larger dose and intensity of nicotine and toxics in Plaintiff's brain, body and developing cells.

40. Plaintiff Alvin Bick began smoking cigarettes as a child at or before the age of 15.

41. By age 15, Plaintiff Alvin Bick was smoking 2-9 cigarettes a day and increased to smoking a half-pack a day.

42. By age 16, Plaintiff Alvin Bick was smoking a pack a day.

43. By age 17-18, Plaintiff Alvin Bick was over a one pack a day.

44. At his peak, Plaintiff Alvin Bick was up to two packs a day.

45. Plaintiff Alvin Bick was primarily exposed to cigarette smoke as a child from R.J. Reynolds (and its successor-in-interest) and Philip Morris' cigarettes.

46. Plaintiff Alvin Bick's brain was irrevocably changed, altered, and damaged by cigarette smoke and nicotine addiction when he was a child.

47. After Plaintiff Alvin Bick's brain was changed by addiction to cigarettes, Plaintiff Alvin Bick primarily smoked R.J. Reynolds / Reynolds American Brands and IRG Brands/Imperial Brands branded cigarettes.

48. Plaintiff Alvin Bick recalls that smoking was everywhere and no one gave it a second thought to smoking anywhere.

49. Plaintiff Alvin Bick recalls in the late 1980s and 1990s seeing and hearing about the "controversy" that smoking and smoke is not dangerous and just overblown government nanny-state protection. And that if cigarette smoke was really dangerous, tobacco companies would tell people the truth, and there would be no cigarette smoke on airplanes, buses, and in restaurants, hospitals, and workplaces.

50. Plaintiff Alvin Bick recalls watching TV and seeing spokespersons for tobacco, explaining how and why cigarette smoke is safe and has not been proven to be harmful, and seeing and/or hearing about the "Truth Squad."

51. Plaintiff Alvin Bick also recalls seeing newspapers and/or magazines that talked about how cigarette smoke is not dangerous or harmful.

52. Plaintiff Alvin Bick also recalls seeing, reading, and browsing the Philip Morris Magazine in the 1980s and 1990s.

53. In the early to mid-2000s, Plaintiff found out that the Tobacco Companies had admitted they were lying to people, doctors, and government regulators, and that cigarette smoke was harmful and caused many different cancers, illnesses, and disease.

54. Beginning in the mid-to-late 2000s, Plaintiff Alvin Bick struggled mightily in attempting to smoke less and quit but had a lot of difficulty quitting.

55. Plaintiff Alvin Bick tried quitting cold turkey, numerous times, and using Nicorette gum.

56. Around 2013, Plaintiff Alvin Bick was able to finally cease smoking cigarettes.

57. In January of 2005, Plaintiff Alvin Bick was admitted to the hospital for a Heart Attack.

58. In August of 2024, Plaintiff Alvin Bick was diagnosed with Emphysema.

59. Plaintiff Alvin Bick will likely suffer more cigarette smoking related diseases and illnesses in the future.

60. Defendants Philip Morris', R.J. Reynolds', and Walgreens' fraud, misrepresentation, and conspiracy was a substantial contributing factor as to why Plaintiff Alvin Bick started smoking as a young child, why he became severely addicted, why Plaintiff Alvin Bick's brain was changed by nicotine addiction, why Plaintiff Alvin Bick (and everyone else) could smoke nearly universally everywhere with the near universal belief that cigarette smoke is not harmful to babies or to the elderly. In fact, the tobacco Industry stated repeatedly that cigarette smoke causes no harm to infants and babies and that actually babies that are exposed to cigarette smoke are healthier and that milk and chlorinated water was more dangerous than cigarette smoke.

61. Plaintiff Daniel Ford resides in Madison County, Illinois and ingested cigarette smoke from Defendants' cigarette products in Madison County, Illinois.

62. Plaintiff Daniel Ford was born in 1961.

63. Plaintiff Daniel Ford's parents, family members, friends, teachers, mentors, neighbors all smoked cigarettes, and cigarette smoke was all around Plaintiff Daniel Ford growing up and into adult life. Plaintiff Daniel Ford's family members and close friends and neighbors smoked R.J. Reynolds and Philip Morris brand cigarette products.

64. Secondhand smoke created in Plaintiff Daniel Ford's growing and developing body and brain as a child a psychological pre-addiction to cigarette smoke, along with embedding cigarette smoke toxins into Plaintiff Daniel Ford's body at a young and developing age.

65. As a child, cigarette butts, cigarette packs, loose cigarettes, and cigarette vending machines (along with ashtrays and cigarette match boxes) were always around and available at Plaintiff Daniel Ford's home, friends' homes, or in car-doors, bus-seats, or airplane seat ashtrays.

66. Plaintiff had extensive secondhand smoke exposure, which was multiple times more powerful than exposure to grown adults due to the Plaintiff's developing and growing child body which created a larger dose and intensity of nicotine and toxics in Plaintiff's brain, body and developing cells.

67. Plaintiff Daniel Ford began smoking cigarettes as a child at around age 8.

68. By age 12, Plaintiff Daniel Ford was smoking a half-pack a day.

69. By age 13, Plaintiff Daniel Ford was smoking a pack a day.

70. By age 15, Plaintiff Daniel Ford was over a one pack a day.

71. At his peak, Plaintiff Daniel Ford was up to two packs a day.

72. Plaintiff Daniel Ford was primarily exposed to cigarette smoke as a child from R.J. Reynolds (and its successor-in-interest) and Philip Morris' cigarettes.

73. Plaintiff Daniel Ford's brain was irrevocably changed, altered and damaged by cigarette smoke and nicotine addiction when he was a child.

74. After Plaintiff Daniel Ford's brain was changed by addiction to cigarettes, Plaintiff Daniel Ford primarily smoked Altria/ Philip Morris Brands and R.J. Reynolds/ Reynolds American Brands branded cigarettes.

75. Plaintiff Daniel Ford recalls that smoking was everywhere and no one gave it a second thought to smoking anywhere.

76. Plaintiff Daniel Ford recalls in the late 1980s and 1990s seeing and hearing about the "controversy" that smoking and smoke is not dangerous and just overblown government nanny-state protection. And that if cigarette smoke was really dangerous, tobacco companies would tell people the truth, and there would be no cigarette smoke on airplanes, buses, and in restaurants, hospitals, and workplaces.

77. Plaintiff Daniel Ford recalls watching TV and seeing spokespersons for tobacco, explaining how and why cigarette smoke is safe and has not been proven to be harmful, and seeing and/or hearing about the "Truth Squad."

78. Plaintiff Daniel Ford also recalls seeing newspapers and/or magazines that talked about how cigarette smoke is not dangerous or harmful.

79. Plaintiff Daniel Ford also recalls seeing, reading, and browsing the Philip Morris Magazine in the 1980s and 1990s.

80. In the early to mid-2000s, Plaintiff found out that the Tobacco Companies had admitted they were lying to people, doctors, and government regulators, and that cigarette smoke was harmful and caused many different cancers, illnesses, and disease.

81. Beginning in the early 2000's, Plaintiff Daniel Ford struggled mightily in attempting to smoke less and quit, but had a lot of difficulty quitting.

82. Plaintiff Daniel Ford tried quitting cold turkey, numerous times, and using Nicorette gum.

83. In 2019, Plaintiff Daniel Ford was able to finally cease smoking cigarettes.

84. In November of 2024, Plaintiff Daniel Ford was diagnosed with Kidney Cancer.

85. Plaintiff Daniel Ford will likely suffer more cigarette smoking related diseases and illnesses in the future.

86. Defendants Philip Morris', R.J. Reynolds', and Walgreens' fraud, misrepresentation, and conspiracy was a substantial contributing factor as to why Plaintiff Daniel Ford started smoking as a young child, why he became severely addicted, why Plaintiff Daniel Ford's brain was changed by nicotine addiction, why Plaintiff Daniel Ford (and everyone else) could smoke nearly universally everywhere with the near universal belief that cigarette smoke is not harmful to babies or to the elderly. In fact, the Tobacco Industry stated repeatedly that cigarette smoke causes no harm to infants and babies and that actually babies that are exposed to cigarette

smoke are healthier and that milk and chlorinated water was more dangerous than cigarette smoke.

87. Plaintiff Steven Strader resides in Madison County, Illinois, ingested cigarette smoke from Defendants' cigarette products in Madison County, Illinois, and purchased Defendants' cigarette products in Madison County, Illinois.

88. Plaintiff Steven Strader was born in 1954.

89. Plaintiff Steven Strader's parents, family members, friends, teachers, mentors, neighbors all smoked cigarettes, and cigarette smoke was all around Plaintiff Steven Strader growing up and into adult life. Plaintiff Steven Strader's family members and close friends and neighbors smoked R.J. Reynolds and Philip Morris brand cigarette products.

90. Secondhand smoke created in Plaintiff Steven Strader's growing and developing body and brain as a child a psychological pre-addiction to cigarette smoke, along with embedding cigarette smoke toxins into Plaintiff Steven Strader's body at a young and developing age.

91. As a child, cigarette butts, cigarette packs, loose cigarettes, and cigarette vending machines (along with ashtrays and cigarette match boxes) were always around and available at Plaintiff Steven Strader's home, friends' homes, or in car-doors, bus-seats, or airplane seat ashtrays.

92. Plaintiff had extensive secondhand smoke exposure, which was multiple times more powerful than exposure to grown adults due to the Plaintiff's

developing and growing child body which created a larger dose and intensity of nicotine and toxics in Plaintiff's brain, body and developing cells.

93. Plaintiff Steven Strader began smoking cigarettes as a child at around age 9.

94. By age 13, Plaintiff Steven Strader was smoking a half-pack a day.

95. By age 16, Plaintiff Steven Strader was smoking a pack a day and increased to over a pack a day.

96. At his peak, Plaintiff Steven Strader was up to two packs a day.

97. Plaintiff Steven Strader was primarily exposed to cigarette smoke as a child from R.J. Reynolds (and its successor-in-interest) and Philip Morris' cigarettes.

98. Plaintiff Steven Strader's brain was irrevocably changed, altered and damaged by cigarette smoke and nicotine addiction when he was a child.

99. After Plaintiff Steven Strader's brain was changed by addiction to cigarettes, Plaintiff Steven Strader primarily smoked Altria / Philip Morris Brands, R.J. Reynolds / Reynolds American Brands, and IRG Brands / Imperial Brands branded cigarettes.

100. Plaintiff Steven Strader recalls that smoking was everywhere and no one gave it a second thought to smoking anywhere.

101. Plaintiff Steven Strader recalls in the late 1980s and 1990s seeing and hearing about the "controversy" that smoking and smoke is not dangerous and just overblown government nanny-state protection. And that if cigarette smoke was really

dangerous, tobacco companies would tell people the truth, and there would be no cigarette smoke on airplanes, buses, and in restaurants, hospitals, and workplaces.

102. Plaintiff Steven Strader recalls watching TV and seeing spokespersons for tobacco, explaining how and why cigarette smoke is safe and has not been proven to be harmful, and seeing and/or hearing about the "Truth Squad."

103. Plaintiff Steven Strader also recalls seeing newspapers and/or magazines that talked about how cigarette smoke is not dangerous or harmful.

104. Plaintiff Steven Strader also recalls seeing, reading, and browsing the Philip Morris Magazine in the 1980s and 1990s.

105. In the early to mid-2000s, Plaintiff found out that the Tobacco Companies had admitted they were lying to people, doctors, and government regulators, and that cigarette smoke was harmful and caused many different cancers, illnesses, and diseases.

106. In 2014, Plaintiff Steven Strader struggled mightily in attempting to smoke less and quit but had a lot of difficulty quitting.

107. Plaintiff Steven Strader attempted to quit smoking cold turkey.

108. In late 2014, Plaintiff Steven Strader was able to finally cease smoking cigarettes.

109. In August of 2025, Plaintiff Steven Strader was diagnosed with Peripheral Vascular Disease.

110. Plaintiff Steven Strader will likely suffer more cigarette smoking related diseases and illnesses in the future.

111. Defendants Philip Morris', R.J. Reynolds', and Walgreens' fraud, misrepresentation, and conspiracy was a substantial contributing factor as to why Plaintiff Steven Strader started smoking as a young child, why he became severely addicted, why Plaintiff Steven Strader's brain was changed by nicotine addiction, why Plaintiff Steven Strader (and everyone else) could smoke nearly universally everywhere with the near universal belief that cigarette smoke is not harmful to babies or to the elderly. In fact, the Tobacco Industry stated repeatedly that cigarette smoke causes no harm to infants and babies and that actually babies that are exposed to cigarette smoke are healthier and that milk and chlorinated water was more dangerous than cigarette smoke.

***Allegations of the Tobacco Manufacturers' Unlawful Conduct Giving Rise to the Lawsuit***

112. In 2006, the United States brought civil racketeering charges against nine cigarette manufacturers—including Philip Morris and R.J. Reynolds — for "engaging in a lengthy, unlawful conspiracy to deceive the American public about the health effects of smoking and environmental tobacco smoke, the addictiveness of nicotine, the health benefits from low tar, 'light' cigarettes, and their manipulation of the design and composition of cigarettes in order to sustain nicotine addiction." *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 26–27 (D.D.C. 2006).

113. Finding Philip Morris and R.J. Reynolds in this case liable, the federal district court wrote:

> It is about an industry, and in particular these Defendants, that survives, and profits, from selling a highly addictive product which causes diseases that lead to a staggering number of deaths per year, an immeasurable

> amount of human suffering and economic loss, and a profound burden on our national health care system. Defendants have known many of these facts for at least 50 years or more. Despite that knowledge, they have consistently, repeatedly, and with enormous skill and sophistication, denied these facts to the public, to the Government, and to the public health community. Moreover, in order to sustain the economic viability of their companies, Defendants have denied that they marketed and advertised their products to children under the age of eighteen and to young people between the ages of eighteen and twenty-one in order to ensure an adequate supply of "replacement smokers," as older ones fall by the wayside through death, illness, or cessation of smoking. In short, Defendants have marketed and sold their lethal product with zeal, with deception, with a single-minded focus on their financial success, and without regard for the human tragedy or social costs that success exacted." *Id.* at 28.

The D.C. Circuit Court of Appeals upheld these factual findings in 2009. *United States v. Philip Morris USA Inc.*, 566 F.3d 1095 (D.C. Cir. 2009).

114. This lawsuit arises from the same factual bases, and relies on much of the same evidence, as the United States' lawsuit against, among others, Philip Morris and R.J. Reynolds.

115. Since 1953, R.J. Reynolds and Philip Morris widely and continuously publicized false or misleading statements intended to deceive the American consumers, including but not limited to the following:

a. that smoking is not addictive;

b. that smoking is not injurious to health;

c. that it is unknown if smoking causes serious diseases;

d. that scientific and medical community has not reached a consensus about the harms of smoking;

e. that no one knows what causes cancer;

f. that the tobacco industry made an honest effort to study the harms of smoking and a causal relationship had not been proven;

g. that filter, low tar and low nicotine, light and ultra-light cigarettes are safe or safer.

116. However, as revealed by R.J. Reynolds' and Philip Morris' internal documents, at all times material to this action, Philip Morris and R.J. Reynolds knew or had reason to know:

a. that smoking cigarettes greatly increased the risk of a smoker developing esophageal cancer, lung cancer, emphysema, COPD, heart disease, other forms of cancer, suffering a stroke and/or sustaining other injuries and/or damages to the lungs, respiratory system, immune system, genetic makeup, and other related physical conditions when used as intended;

b. that the diseases and/or injuries listed above would be more likely experienced if users such as the smoker did not restrict their intake of Defendants' cigarettes, or if they began to use such products at an early age;

c. that use of the products as intended was more likely than not to lead to addiction, habituation, physical, and/or psychological dependence, particularly if begun at an early age;

d. that termination or limitation of use would be exceedingly difficult if consumption was initiated and that this difficulty would increase as cumulative consumption increased;

e. that developing knowledge before and after 1970 demonstrated that previous users are at great risk of harm, as set forth above, and should seek medical monitoring;

f. that cigarette sellers could develop a reasonably safe dose for foreseeable users;

g. that there were feasible improvements in design, composition, or manufacture of cigarettes such as to materially decrease the foreseeable risk to users such as the smoker;

h. that switching to or continuing to smoke filtered, low tar, low nicotine and/or "light" cigarettes would not be less hazardous because smokers would smoke more and/or alter their smoking habits such that their intake of tar, nicotine and other harmful substances would not be reduced;

i. that the Federal Trade Commission ("FTC") method of measuring "tar & nicotine" levels underestimated and did not accurately reflect the levels of tar and nicotine actually delivered to an actual smoker.

117. Nevertheless, Philip Morris and R.J. Reynolds designed, manufactured, advertised, marketed, distributed and/or sold cigarettes which, when

used as intended, were more likely than not to induce in foreseeable users like Plaintiffs a state of addiction, habituation, habit formation and/or dependence characterized by the user's inability to terminate or restrict his/her chronic use, which would more likely than not cause various illnesses, including Plaintiffs' illnesses, diseases and/or cancers.

118. Philip Morris and R.J. Reynolds entered into a conspiracy with other manufacturers, such as American Tobacco Company, Lorillard Tobacco Company, Brown and Williamson Tobacco Company, and British American Tobacco Company ("Manufacturers").

119. Philip Morris and R.J. Reynolds engaged in a conspiracy to misrepresent the harms of smoking cigarettes, secondhand smoke, so-called "filter," "light," and "low tar" cigarettes, and the addictive qualities of nicotine. The co-conspirators include, but are not limited to, R.J. Reynolds, Philip Morris, British American Tobacco Company, American Tobacco Company, Lorillard Tobacco Company, Brown & Williamson Tobacco Company, Committee of Counsel (CC), Ad Hoc Committee, Scientific Advisory Board, Tobacco Industry Research Committee (TIRC), Counsel for Tobacco Research (CTR), Hill and Knowlton, Special Projects, Tobacco Manufacturers' Association, AMA ERF, Center for Indoor Air Research ("CIAR"), the Associates for Research into the Science of Enjoyment ("ARISE"), and several law firms.[1]

[1] These include some of the co-conspirators. Dr. Robert Proctor's reports and prior testimony identify most or all other law firms and organizations involved in the conspiracy.

120. To effectively defraud and mislead American consumers like Plaintiffs, Philip Morris and R.J. Reynolds established and funded organizations like the Tobacco Industry Research Committee ("TIRC") and the Tobacco Institute ("TI") to attack valid scientific scholarship that proved a link between smoking and cancer, and to convince consumers that cigarettes are not dangerous.

121. Philip Morris and R.J. Reynolds and their organizations maintained this misinformation campaign throughout Plaintiffs' child and teenage years as well as most of Plaintiffs' adult lives. It took form in various public statements such as:

a. Calling the Surgeon General's 1979 report on cigarettes' link to cancer "suspect from the start;"

b. Press release titled "CLAIMS THAT CIGARETTES ARE ADDICTIVE CONTRADICT COMMON SENSE," which attacked the Surgeon General's 1988 report;

c. Defendants' CEOs' under-oath denial that cigarettes are addictive or cancer-causing in a 1994 congressional hearing, which was broadcast over national news networks;

d. Continuous public messaging that the tobacco industry was actively conducting and publishing honest scientific research on the link between smoking and cancer, and that it would not sell consumers, including Plaintiffs, a product that they knew would cause her cancer; and

e. Numerous TV, magazine, and billboard advertisements touting or implying the health benefits of filtered, or low-tar, or light, or ultra-light cigarettes.

***Walgreens' Direct Conspiratorial Involvement with the Tobacco Industry and Philip Morris***

122. Walgreens was not merely a passive retailer of cigarettes. Walgreens directly communicated and coordinated with tobacco-industry entities, including the Tobacco Institute and Philip Morris, in ways that promoted, aided, abetted, and furthered the tobacco industry's fraud, misrepresentations, concealment, and public-relations campaign.

123. As early as 1971, Walgreens had actual notice that members of the public were raising smoking-and-cancer concerns with Walgreens. In response to a letter addressed to Walgreens' president by a Chicago-area registered nurse concerning smoking and laryngeal cancer, Lorillard asked the Tobacco Institute to provide Walgreens an "appropriate written reply." The Tobacco Institute supplied proposed messaging to Walgreens that framed the issue as a "cigarette controversy," claimed there was "so much conflicting evidence," and asserted that tobacco-industry research funding would provide answers. See Letter from Anne Duffin of the Tobacco Institute to Robert Schwab of Walgreen Drug Stores, dated December 23, 1971.

124. In March 1977, Walgreens' Manager of News and Information Services, David C. Carlson, wrote to Tobacco Institute President Horace R. Kornegay that Walgreens was "exploring the possibilities of an information program which will help both the tobacco industry and ourselves." Walgreens expressly tied this

contemplated information program to its public reputation as a health care retailer, stating that Walgreens did not want to step into the middle of a "raging controversy," but that, as an established "health center," there were "many, many things" Walgreens could do to "gain and maintain the understanding and support of the public." See Letter from David C. Carlson to Horace R. Kornegay, dated March 16, 1977, Bates No. TIMN0083435.

125. The next day, Tobacco Institute President Horace R. Kornegay circulated an internal memorandum concerning "Walgreen Drugs" stating that Walgreens had expressed interest in "being of assistance to the tobacco industry in getting the true word put about" and had a "real interest in being of every possible assistance" to the tobacco industry. The Tobacco Institute proposed sending Walgreens literature about the Tobacco Institute and prior public-relations projects and then meeting with Walgreens to discuss "what and how" Walgreens and Carlson "could be of help." See Memorandum from Horace R. Kornegay to William Kloepfer, Jr., dated March 17, 1977, Bates No. TIMN0083434.

126. On March 18, 1977, the Tobacco Institute followed up with Carlson and thanked him for his interest in "pitching in somehow in defense of the unwarranted attack on your tobacco customers." The Tobacco Institute enclosed materials from a prior industry-supported project, described how the Tobacco Institute paid for printing, and explained how local sales offices of major member companies helped distribute materials. See Letter from William Kloepfer, Jr. to David C. Carlson, dated March 18, 1977.

127. These communications show that Walgreens knowingly explored and participated in a relationship with the Tobacco Institute designed to place tobacco-industry messaging before the public while leveraging Walgreens' credibility as a pharmacy and health care retailer. Walgreens' participation was valuable to the tobacco industry precisely because Walgreens' reputation as a health center could make pro-tobacco messaging appear more neutral, credible, and health-related than if the same message came directly from the cigarette manufacturers.

128. By the 1990s, Walgreens' conspiratorial assistance to the Tobacco Industry also included a highly coordinated commercial relationship with Philip Morris. Philip Morris created confidential Walgreens-specific operations manuals and business plans that identified Walgreens' corporate structure, Walgreens' district managers, Walgreens' buyers, Walgreens/Philip Morris contacts, distributor contacts, merchandising strategy, point-of-sale strategy, promotions, fixtures, plan-o-grams, compliance procedures, and authorized Philip Morris brands.

129. The 1994 Philip Morris Walgreens Operations Manual, marked "CONFIDENTIAL FOR INTERNAL PM USA ONLY," described Walgreens as a leading drugstore chain with nearly two million daily customers and emphasized Walgreens' computerized pharmacy service, convenience, and neighborhood-corner strategy. It further stated that Walgreens' headquarters and Philip Morris' national accounts were responsible for merchandising and point-of-sale activity, while Walgreens district managers worked with local Philip Morris account managers regarding local merchandising, point-of-sale activity, and promotions.

130. Philip Morris' 1994 Walgreens Account Game Plan identified Walgreens' desire to "maximize category profitability," Walgreens' willingness to promote, and the need for Walgreens and Philip Morris to "partner" to determine strategies and tactics to increase cigarette sales and profitability. The plan contemplated using Philip Morris standard promotions and Flex Fund promotions, analyzing Walgreens scanning data, developing in-store sales recommendations, and proposing a product mix to optimize Walgreens' cigarette profitability.

131. The 1995 Philip Morris Walgreens Operations Manual, also marked "CONFIDENTIAL FOR INTERNAL PM USA ONLY," stated that Walgreens and Philip Morris had a Retail Masters agreement and described Philip Morris-supplied fixtures, merchandising, promotions, communications, headquarters payments, Retail Masters compliance, plan-o-grams, store layout, and authorized Philip Morris brands. The plan-o-gram assigned Philip Morris 50 percent of the Walgreens cigarette fixture share and provided store-level display and inventory directions designed to increase Philip Morris' sales and maintain tobacco visibility in Walgreens stores.

132. The 1996 Philip Morris Walgreens Business Plan, marked "Confidential" and "For Walgreen's/PM USA Use Only," described Walgreens' overall mission as becoming the nation's most convenient health care provider while identifying tobacco as four percent of Walgreens' total business and cigarettes as a convenience category. The plan sought to increase cigarette category sales and improve cigarette inventory turns and profitability through pricing, promotions,

inventory management, point-of-sale execution, price call-outs, plan-o-grams, and coordinated activity between Philip Morris and Walgreens personnel.

133. Walgreens' acts in furtherance of the conspiracy included, but were not limited to, using its trusted pharmacy and health care reputation to normalize cigarette sales; coordinating with the Tobacco Institute about public messaging concerning the smoking-and-health controversy; accepting Tobacco Institute literature and proposed public-relations materials; coordinating with Philip Morris on cigarette merchandising, fixtures, promotions, price call-outs, coupons, and plan-o-grams; implementing or allowing Philip Morris store-level compliance systems; and selling cigarettes in a health care retail environment in a manner that concealed, minimized, or contradicted the true dangers and addictiveness of cigarettes.

134. Walgreens' cooperation with the Tobacco Institute and Philip Morris supplied the Tobacco Industry with a powerful distribution and credibility channel. Walgreens' stores provided repeated point-of-sale exposure, normalized the presence of cigarettes in pharmacies and health care retail spaces, and reinforced the Tobacco Industry's message that cigarettes were ordinary consumer products rather than highly addictive, defective, carcinogenic products that caused disease and death when used as intended.

135. Walgreens' conduct was undertaken for Walgreens' own financial benefit and for the benefit of the tobacco industry. Walgreens profited from cigarette sales, Philip Morris profited from increased cigarette sales and continued nicotine

addiction, and the tobacco industry benefited from Walgreens' trusted name, health care retail setting, and ability to place and promote cigarettes before consumers while the tobacco industry continued to conceal and misrepresent the true hazards of cigarettes and nicotine addiction.

### *Conspiratorial Involvement by General Counsel for Tobacco Companies & Outside Law Firms*

136. R.J. Reynolds and Philip Morris entered into a conspiracy with other manufacturers, which included, among others, the following: American Tobacco Company, Lorillard Tobacco Company, Brown and Williamson Tobacco Company, and British American Tobacco Company (the Manufactures).

137. Throughout the conspiracy, R.J. Reynolds, Philip Morris, and their co-conspirator Manufacturers utilized attorneys – both in-house and outside counsel – to further their conspiracy to conceal and misrepresent the harms of smoking cigarettes, secondhand smoke, so-called "filter," "light," and "low tar" cigarettes, and the addictive qualities of nicotine. Philip Morris, R.J. Reynolds, and their co-conspirators engaged in a fraud directed nationally and at the State of Illinois with these attorneys both before any litigation was contemplated, and once litigation against the tobacco companies began.

138. R.J. Reynolds, Philip Morris, British American Tobacco Company, American Tobacco Company, Lorillard Tobacco Company, and Brown & Williamson Tobacco Company, collectively and through their general counsel offices, formed an association known by differing names over time as the Committee of Counsel and/or the Counsel of Six ("CC"), whose purpose was to oversee, organize,

operate, and execute a conspiracy to conceal and misrepresent the harms and addictive nature of cigarettes.

139. Beginning in the 1950s, R.J. Reynolds, Philip Morris, British American Tobacco Company, American Tobacco Company, Lorillard Tobacco Company, and Brown & Williamson Tobacco Company, through the CC, retained outside counsel to assist them in their conspiratorial activities which included to conceal and misrepresent the harms of smoking and its addictive nature to the public.

140. R.J. Reynolds, Philip Morris, and their co-conspirators retained as outside counsel several law firms, including, Shook, Covington, JMF, Womble, and others.

141. Beginning in the 1950s, and continuing during the relevant time periods, the CC and the outside law firms (hereafter "Lawyers") conspired with R.J. Reynolds, Philip Morris, and their other co-conspirators and acted as agents, servants, representatives and/or employees of R.J. Reynolds, Philip Morris, and their co-conspirators in furtherance of the conspiracy.

142. The Lawyers played a central role in the creation and perpetuation of the conspiracy and the implementation of its fraudulent schemes throughout the United States as well as in Illinois, including but not limited to the following:

a. The Lawyers oversaw domestic smoking and health projects;

b. The Lawyers directed "scientists" as to what research they should and should not undertake;

c. The Lawyers were involved at every level of alleged scientific "research" pursued by Defendants and the tobacco industry;

d. The Lawyers devised and carried out document destruction policies and took shelter behind baseless assertions of attorney client privilege;

e. The Lawyers also worked with and coached scientists on how to be serve as a witness in litigation, how to speak at legislative hearings, how to serve as consultants, and how to conduct specific supposed research;

f. The Lawyers screened international scientists in order to eliminate those with views opposing the conspiracy;

g. The Lawyers directed and oversaw the false and misleading public positions and statements made by the Defendants and those through the TIRC/CTR and TI;

h. The Lawyers directed and oversaw false and or misleading submissions to public health authorities and governmental entities regarding the harms of smoke in cigarettes;

i. The Lawyers cleared cigarettes advertisements for the Defendants to ensure the continuation of the conspiracy;

j. The Lawyers directed a massive denial campaign to create false expectations about the safety of cigarette smoke in general including smoking cigarettes and secondhand smoke;

k. The Lawyers provided false and misleading testimony and submissions to governmental agencies regarding the safety of cigarette smoke in general including smoking cigarettes and secondhand smoke;

l. The Lawyers engaged and assisted Philip Morris and R.J. Reynolds in conduct that the Lawyers knew was fraudulent;

m. The Lawyers hid the source of the money used for special projects to make them appear more acceptable to the public; and

n. The Lawyers ensured that R.J. Reynolds and Philip Morris, and the tobacco industry did not directly support legitimate projects related to smoking and health and instead directed the companies toward supporting alternative projects including junk science, attacks on legitimate public health research, and research of scientifically implausible alternative causation theories for smoking-related diseases.

**COUNT 1: FRAUD / FRAUDULENT MISREPRESENTATION**
**(R.J. Reynolds and Philip Morris)**

143. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

144. Beginning at an exact time unknown to Plaintiffs, and continuing even today, the cigarette manufacturers, including R.J. Reynolds and Philip Morris, have carried out, and continue to carry out a campaign designed to deceive the public, Plaintiffs, the government, and others as to the health hazards of smoking and the addictive nature of smoking, through fraudulent statements, false statements, and/or misrepresentations of material facts in interviews, testimony and print, radio, and television advertising.

145. The cigarette manufacturers, including R.J. Reynolds and Philip Morris, made literally hundreds of misrepresentations to Plaintiffs and others similarly situated over the course of the last 50 years. Plaintiffs are unable to allege in full the thousands of pre-1968 advertisements, and the continuing press releases, testimony by cigarette manufacturers' officers and employees before Congress and other governmental entities, that the cigarette manufacturers and their co-conspirators, TOBACCO INDUSTRY RESEARCH COMMITTEE ("TIRC") formed in 1954, the TOBACCO INSTITUTE, INC. ("TI") formed in 1958, and COUNCIL for TOBACCO RESEARCH ("CTR") formed in 1964 and previously known as the TIRC, have prepared, participated in, given, and released over the last almost 50 years both because they do not have access to this information, and because to allege each and every such misrepresentation and/or false statement here would entail hundreds or even thousands of pages of pleadings; indeed, it is the cigarette manufacturers themselves, including R.J. Reynolds and Philip Morris, which have this knowledge and

information, and are in the best position to know the contents of each and every such misrepresentation and/or false statement.

146. The cigarette manufacturers, including R.J. Reynolds and Philip Morris, carried out their campaign of fraud, false statements, and/or misrepresentations in at least the following ways:

a. they agreed falsely to represent to Plaintiffs and others similarly situated that questions about smoking and health would be answered by an unbiased, and trustworthy source;

b. they misrepresented and confused the facts about the health dangers of smoking, including addiction;

c. the cigarette manufacturers claimed, falsely, that there is insufficient "objective" research to determine if cigarette smoking causes disease and that cigarettes are not addictive;

d. the cigarette manufacturers, R.J. Reynolds and Philip Morris, used lawyers to misdirect what purported to be objective scientific research, yet maintained to Plaintiffs and others similarly situated that such objective scientific research was being conducted and that the results of such research would be made public;

e. to discourage meritorious litigation by plaintiffs injured due to cigarettes, they engaged in "scorched earth" litigation tactics in combination with suppressing and distorting evidence to protect

the cigarette manufacturers, including R.J. Reynolds and Philip Morris, existence and profits;

f. by designing, selling, and marketing so called "Light" cigarettes as being substantially lower in tar and nicotine than regular, or non-light cigarettes and therefore healthier or safer for consumers. R.J. Reynolds and Philip Morris knew that the system to measure the tar and nicotine was neither a valid nor reliable way to measure the amount of tar and nicotine inhaled by an actual smoker. Notwithstanding same, R.J. Reynolds and Philip Morris marketed their "Light" cigarettes to consumers as a safer alternative. R.J. Reynolds and Philip Morris manipulated the design of cigarettes to produce test results that were artificially low. Furthermore, R.J. Reynolds and Philip Morris knew that "Light" cigarette smokers may compensate to obtain the same level of tar or nicotine as non-light cigarettes either by taking more puffs on each cigarette, by taking larger, longer or deeper puffs, or by smoking more cigarettes;

g. by continuing to fraudulently market and sell "mild," "low tar," and "light" cigarettes through 2010 despite knowing they were no safer than full flavor cigarettes and knowing consumers perceived them as safer. The cigarette manufacturers, including R.J. Reynolds and Philip Morris, were ultimately prohibited by Congress from

marketing "mild," "low tar," and "light" cigarettes when Congress passed the Family Smoking Prevention and Tobacco Control Act, Public Law 111-31 (June 22, 2009), which became effective on June 22, 2010. Despite the congressional ban, the cigarette manufacturers, including R.J. Reynolds and Philip Morris, have continued to market and sell even today the same "mild," "low tar," and "light" cigarettes, only now these cigarettes are marketed with a new coloring scheme instead of the banned light descriptors. These cigarettes are the same or substantially the same cigarettes as the pre-prohibition cigarettes. Consumers often perceive the color descriptors on packaging as suggesting less harmful to smoke than regular or full flavor brands. The cigarette manufacturers, including R.J. Reynolds and Philip Morris, are thus able to continue fraudulently misrepresenting the "light," "low tar," and "mild" cigarette marketing the ban was designed to prevent; and

h. by continuing even today to fraudulently market and sell multiple brands as "filtered" knowing that smokers wrongly believe that filtered cigarettes reduce the harms of smoking. The word "filter" implies filtration of the smoke and therefore relative safety. However, R.J. Reynolds and Philip Morris and the tobacco industry knew filtered cigarettes provide no health benefit as

proven by numerous reliable epidemiologic studies that have shown that filtered cigarettes are no safer than non-filtered cigarettes.

147. Cigarette manufacturers, including R.J. Reynolds and Philip Morris, knew that cigarettes were dangerous and addictive. It became the practice, purpose, and goal of the cigarette manufacturers to question any scientific research which concluded that cigarettes were a health hazard. They did this through media campaigns, mailings to doctors and other scientific professionals, and through testimony before governmental bodies.

148. Joint industry efforts undertaken by the TIRC and the CTR were neither disinterested nor objective. Industry documents, recently revealed, show that CTR functioned not for the promotion of scientific goals, but for the purposes of public relations, politics, and positioning for litigation. The TIRC and CTR were used to support an industry strategy of denying or creating doubt that smoking causes disease. For example, in 1967, G.F. Todd of the CTR wrote a letter to Mr. Addison Yeaman. Mr. Yeaman was the Vice President and General Counsel of BROWN & WILLIAMSON TOBACCO COMPANY. In his letter, Todd observed:

> The only real difficulties that we encountered arose out of the unavoidable paradox at the center of our operations - namely that, on the one hand the manufacturers control TRC's operations and do not accept that smoking has been proved to cause lung cancer while, on the other hand, TRC's research program is based on the working hypothesis that this has been sufficiently proved for

research purposes. In addition, the Council senior scientists accept the causation theory...We have not yet found the best way of handling this paradox.

149. Despite R.J. Reynolds', and Philip Morris', and the industry's promises "to help scientists determine the facts about tobacco use and health" and claiming to support research concerning tobacco and health, R.J. Reynolds, Philip Morris and the industry did not conduct the research they represented that they would conduct.

150. Instead of conducting the research it promised to do, R.J. Reynolds and Philip Morris focused their efforts on attacking health-related research that showed the dangers of smoking to keep alive a public controversy over whether tobacco smoke was harmful.

151. The tobacco industry paid for advertisements in major newspapers to attack legitimate research. For example, in 1969, the American Tobacco Company, a successor to R.J. Reynolds Tobacco Company stated in the New York Times, "[w]e believe the anticigarette theory is a bum rap."

152. R.J. Reynolds and Philip Morris continued to avoid studying the health effects of smoking while at the same time continuing to publicly insist on the need for more research.

153. The industry's purpose was to give smokers what one industry executive called a "crutch" that would justify their continued smoking.

154. Instead of focusing their efforts on health issues as they represented they would do, R.J. Reynolds and Philip Morris focused on research into modifying their cigarettes to increase their addictiveness.

155. Rather than making its research public as they had represented it would do, R.J. Reynolds and Philip Morris publicly denied and suppressed the results of their research.

156. R.J. Reynolds and Philip Morris continued to engage in a course of conduct where they represented to the public many times throughout the years that they would conduct research and disclose results to the public, while at the same time either hiding any potentially damning results or not conducting bona fide research at all.

157. Throughout the years, R.J. Reynolds and Philip Morris continued to state that cigarettes were not dangerous, and they would either remove harmful constituents or stop making cigarettes altogether. Some examples include:

a. A 1970 advertisement from the Tobacco Institute said: "[t]he Tobacco Institute believes the American public is entitled to complete, authenticated information about cigarette smoking and health."

b. In 1971, Joseph Cullman, Chairman of Philip Morris, stated on Face the Nation, "we do not believe that cigarettes are hazardous; we don't accept that."

c. In 1972 Philip Morris vice president James Bowling repeated the company's promise to consumers two decades earlier that "if our product is harmful, we'll stop making it."

d. Bowling repeated the company's position on smoking and health in a 1976 interview when he noted: "from our standpoint, if anyone ever identified any ingredient in tobacco smoke as being hazardous to human health or being something that shouldn't be there, we could eliminate it. But no one ever has."

e. In a 1978 magazine interview, William Dwyer, Vice President of the Tobacco Institute, stated: "[W]e take the view that the best science can say is that cigarette smoking may be hazardous. And then it may not be."

f. A 1978 Philip Morris publication entitled "Facts About the Smoking Controversy" stated: "scientists have not determined what causes cancer...cigarettes have never been proven unsafe."

g. In 1984, Ed Horrigan, Chairman of R.J. Reynolds, spoke on Nightline and told the public, "It is not known whether cigarettes cause cancer. It has not been causally established."

h. In 1985, R.J. Reynolds took out advertisements in major newspapers and magazines which stated: "We believe in science. That is why we continue to provide funding for independent research into smoking and health…Science is science. Proof is proof. That is why the controversy over smoking and health remains an open one."

i. In 1988, in response to the United States Surgeon General's report that cigarettes are addictive, and nicotine is the drug in tobacco that causes addictions, issuing a press release knowingly and disingenuously stating "Claims that cigarettes are addictive is irresponsible and scare tactics."

j. In 1994, CEOs from the seven largest cigarette companies, including R.J. Reynolds and Philip Morris, knowingly providing false and misleading testimony under oath before the United States Congress that it had not been proven that cigarettes were addictive, caused disease, or caused one single person to die.

158. R.J. Reynolds and Philip Morris continued to make these and similar statements well into the 1990s with the goal of convincing smokers to keep smoking, not reducing their smoking, and/or not quit smoking.

159. R.J. Reynolds and Philip Morris and the tobacco industry promoted their message through many press releases and statements and through less obvious methods, including influencing the content of apparently neutral articles and cultivating opinion leaders who would convey their message. R.J. Reynolds and Philip Morris and the tobacco industry communicated their message through all forms of available media, including newspapers, magazines, and television.

160. Tobacco industry spokespersons appeared on news shows, on commercials, and public television to state that the evidence concerning the health effects of tobacco were based primarily on statistical relationships and that there was no proof that a specific tobacco component caused a specific disease, and that cigarette smoking was not addictive.

161. Cigarette manufacturers, when sued, denied that cigarettes were addictive and claimed that smoking was a matter of free choice and that smokers could quit smoking if they so wanted.

162. The acts, false statements, and/or misrepresentations which were made and/or caused to be made by the cigarette manufacturers, including R.J. Reynolds, Philip Morris and their co-conspirators, were made and/or caused to made with knowledge of their falsity and/or in reckless disregard of the truth.

163. The aforementioned acts, false statements, and/or misrepresentations were made and/or caused to be made by the cigarette manufacturers, including R.J. Reynolds, Philip Morris, and their co-conspirators, for the purposes of inducing Plaintiffs and others similarly situated to rely on such false

statements and/or misrepresentations to induce persons such as Plaintiffs to smoke, fail to quit, or reduce consumption.

164. R.J. Reynolds and Philip Morris knew that Plaintiffs, as well as other customers, did not hold sufficient information to understand or appreciate the dangers of the cigarettes that they smoked.

165. These misrepresentations and false statements about the health hazards of cigarettes also include the following statements, which were heard, read, and relied upon by Plaintiffs, who remembered these statements or substantially similar statements, made by R.J. Reynolds, Philip Morris, their co-conspirators, and their spokesmen and women:

a. Claims by the Tobacco Institute that the American Cancer Society withheld data linking cigarettes and cancer and attacking the industry's position that there is no proof that cigarettes smoking causes lung cancer. Chicago Tribune, May 1, 1970.

b. Ad by the Tobacco Institute criticizing the American Cancer Society and urging consumers not to believe claims that cigarettes cause cancer. Chicago Tribune May 6, 1970.

c. Ad by the Tobacco Institute restating its contention "that there is no laboratory proof of a connection between cigarette smoking and lung cancer." Chicago Tribune May 6, 1970.

d. R.J. Reynolds Tobacco Company ad "Can we have an open debate about smoking?" shedding doubt upon research connecting

cigarette smoking and cancer. Chicago Tribune January 31, 1984.

e. "It is not known whether cigarettes cause cancer, it has not been causally established." Edward Horrigan, President of R.J. Reynolds Tobacco Company on ABC Nightline 1984.

f. "Despite all of the research to date there has been no causal link established [between cigarette smoking and cancer.]" Edward Horrigan, President of R.J. Reynolds Tobacco Company on ABC Nightline 1984.

g. "As a matter of fact, there are studies that while we are accused of being associated with heart disease, there have been studies conducted over 10 years that would say again that science is still puzzled over these forces." Edward Horrigan, President of R.J. Reynolds Tobacco Company on ABC Nightline 1984.

h. "There is absolutely no proof that cigarettes are addictive." Edward Horrigan, CEO of R.J. Reynolds, Congressional Testimony 1982.

i. "Is it your position that it has never been proven that cigarette smoking has caused a single person to die? That is my position, yes." James Johnston, R.J. Reynolds Tobacco Company, Congressional Testimony 1994.

166. The aforementioned acts, false statements, and/or misrepresentations, which were made and/or caused to be made by or on behalf of

R.J. Reynolds, Philip Morris, and the other cigarette manufacturers were made to induce the public and Plaintiffs to believe that cigarettes were not addictive or harmful to their health, to start smoking, and become addicted to nicotine.

167. The aforementioned acts, false statements, and/or misrepresentations, which were made and/or caused to be made by or on behalf of R.J. Reynolds, Philip Morris, and the other cigarette manufacturers, either directly or indirectly including R.J. Reynolds, Philip Morris, and their co-conspirators, were reasonably and justifiably relied upon by Plaintiffs, resulted in Plaintiffs being unaware of the extent of the danger of the R.J. Reynolds' and Philip Morris' cigarette products, the addictive nature of R.J. Reynolds' and Philip Morris' cigarette products, and that filtered cigarettes were just as dangerous as regular and/or unfiltered cigarettes.

168. Furthermore, Plaintiffs relied on all R.J. Reynolds' and Philip Morris' false and misleading marketing and advertising of cigarettes about the health hazards of cigarettes, including, but are not limited to, the following:

a. False and misleading marketing tactics regarding "filtered" cigarettes which caused Plaintiffs to smoke a filtered cigarette and continue to smoke a filtered cigarette.

b. False and misleading marketing tactics aimed at African Americans.

c. False and misleading marketing tactics regarding "low tar" and "mild" cigarettes which caused Plaintiffs to switch to light

cigarettes for a time.

d. False and misleading print advertisements.

169. Plaintiffs, during the course of their smoking histories, heard some or all of the false or misleading statements and/or similar statements made directly or indirectly by R.J. Reynolds, Philip Morris, and their co-conspirators, including advertisements and other marketing materials, falsely representing or suggesting that cigarettes were not as dangerous from a health standpoint than they actually are, that there was no link between cigarettes and various types of cancer, that cigarettes were not addictive, and that light cigarettes were safer and less hazardous than other cigarettes.

170. Believing and relying upon these false and misleading statements made by R.J. Reynolds and Philip Morris in their direct advertisements to consumers and by the R.J. Reynolds, Philip Morris, and their co-conspirators in interviews, testimony, and publications, Plaintiffs did not recognize that cigarettes were addictive, that they posed significant health risks not limited to but including the risk of developing lung cancer, or that "light" and "mild" cigarettes were not less dangerous than regular cigarettes.

171. In further reliance upon the false and misleading statements made by the R.J. Reynolds and Philip Morris in their direct advertisements to consumers and by the R.J. Reynolds, Philip Morris, and their co-conspirators in interviews, testimony, and publications, Plaintiffs switched to light and mild cigarettes, believing them to reduce any potential health risk connected to cigarette smoking.

172. The aforementioned acts, false statements, and/or misrepresentations, which were made and/or caused to be made by the cigarette manufacturers either directly or indirectly, including R.J. Reynolds and Philip Morris, were justifiably relied upon by Plaintiffs, resulting in them being unaware of the extent of the danger of the R.J. Reynolds' and Philip Morris' cigarette products, the addictive nature of R.J. Reynolds' and Philip Morris' cigarette products, and that light cigarettes were not safer than other cigarettes. Such acts, false statements, and/or misrepresentations were made by R.J. Reynolds and Philip Morris who had knowledge superior to Plaintiffs regarding the health aspects of cigarettes including their addictive nature.

173. Had R.J. Reynolds and Philip Morris not made the aforementioned false statements and/or misrepresentations about the dangers of the cigarette products to Plaintiffs and the public, Plaintiffs would have not started smoking, stopped smoking at an earlier age, and/or reduced the number of cigarettes that they consumed, and their risk of injury from cigarettes, including Plaintiffs' illnesses, diseases and/or cancers, would have been reduced or eliminated.

174. As a direct and proximate result of the aforementioned acts, false statements, and/or fraudulent misrepresentations, which were made and/or caused to be made by the cigarette manufacturers, including R.J. Reynolds and Philip Morris, Plaintiffs smoked, continued to smoke, and/or were otherwise exposed to R.J. Reynolds' and Philip Morris' cigarette products which caused to contributed to cause them to develop injuries, including but not limited to lung cancer and COPD, in addition to other

related physical conditions, which resulted in and directly caused Plaintiffs to suffer severe bodily injuries.

WHEREFORE, Plaintiffs pray for judgment against Defendants R.J. Reynolds and Philip Morris for compensatory damages in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs of suit, pre-judgment interest and for any and all such other further relief as this Court deems just and appropriate.

**COUNT 2: FRAUDULENT CONCEALMENT**
**(R.J. Reynolds and Philip Morris)**

175. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

176. R.J. Reynolds, Philip Morris, and other cigarette manufacturers had a duty to disclose material information regarding cigarettes' health hazards because they were in a superior position to consumers, including Plaintiffs. This superior position was established due to the following:

a. As the designers, developers and manufacturers of their cigarette products, R.J. Reynolds, Philip Morris, and other cigarette makers solely possessed knowledge of the ingredients in their products, which they kept strictly confidential from the public;

b. As the designers, developers, and manufacturers of their cigarette products, R.J. Reynolds, Philip Morris, and other cigarette makers were solely aware of additives to their cigarette products and the amounts of such additives, which they kept strictly confidential from the public;

c. As the designers, developers, and manufacturers of their cigarette products, R.J. Reynolds, Philip Morris, and other cigarette makers were solely aware of the effects that additives to their cigarette products had on consumers, which they kept strictly confidential from the public;

d. R.J. Reynolds, Philip Morris, and other cigarette makers undertook research regarding the addictive nature of their cigarettes and knew that nicotine was highly addictive. Moreover, they knew that their cigarettes are highly addictive due to the amount of nicotine they chose to maintain in each cigarette;

e. R.J. Reynolds, Philip Morris, and other cigarette makers advertised and sold filtered, low-tar, and mild cigarettes products, which touted or implied health benefits. However, R.J. Reynolds and Philip Morris knew that these purported benefits were illusory, and that the public—even the US government and physicians—were being misled by their false promises;

f. R.J. Reynolds, Philip Morris, and other cigarette makers undertook internal research regarding the health effects of their cigarettes and knew that cigarette use caused cancer. More importantly, they knew that consumers, including Plaintiffs, were not aware of this scientific determination, and that the public's ignorance was the driving force behind their cigarette sales and

growing revenue;

g. The dangers of smoking are not open and obvious to consumers, especially young consumers, because the harm could occur and accumulate imperceptibly for decades before resulting in cancer;

h. The significant increase in cancer caused by cigarettes is detectable only in aggregate over decades of statistical studies, which the tobacco industry persistently discredited and publicly disputed over each Plaintiff's lifetime;

i. The tobacco industry had superior knowledge not only to consumers but even to the FDA in that it knew the FDA's methodology of measuring tar from filtered cigarettes did not accurately measure tar-intake in actual consumer use; and

j. The addictiveness of nicotine at the level that R.J. Reynolds and Philip Morris put into each cigarette was known to the tobacco manufacturers, and specifically designated by the manufacturers to maintain sales, but was impossible for consumers to detect.

177. R.J. Reynolds, Philip Morris, and other cigarette makers also assumed a duty to disclose material information to their consumers, including Plaintiffs. Their assumption of duty began with the Frank Statement and continued and they reaffirmed their duty repeatedly throughout Plaintiffs' lives, as exhibited by the following conduct:

a. As part of the Frank Statement published in over 400 newspapers

across the United States, the tobacco industry stated, "we believe the products we make are not injurious to health." The companies "accept[ed] an interest in people's health as a basic responsibility, paramount to every other consideration in our business" and pledged "aid and assistance to the research effort into all phases of tobacco use and health" thereby assuming a duty to disclose to the public of any hazards discovered that might affect smokers' health.

b. In addition to the Frank Statement above, R.J. Reynolds and Philip Morris, individually or through the acts of their agents, employees and representatives, further assumed a duty, or acknowledged their duty to disclose, and not fraudulently conceal the harms and addictive nature of smoking cigarettes through various statements to the public or through internal correspondence, including but not limited to the following:

1. Shortly after the Frank Statement was published, George Weissman, a Philip Morris Vice President, through a publicized speech in 1954, told the public that "if we had any thought or knowledge that in any way we were selling a product harmful to consumers, we would stop business tomorrow."
2. Robert N. Dupuis, Chairman of the Industry Technical Group of the Tobacco Industry Research

Committee, stated in 1955 on See It Now on CBS, regarding harmful components in smoke: "As we find these components we publish the results of our work in technical journals which are available to any scientist in any part of the world. So far we've found none that give us any cause for concern. *If we do find any that we consider harmful, and so far we have not, we will remove these from smoke, and still retain the pleasure of your favorite cigarette.*" (Emphasis added).

3. On June 7, 1955, Timothy Hartnett, Chairman of the Tobacco Industry Research Committee, repeated that the tobacco industry had "accepted an interest in people's health as a basic responsibility paramount to every other consideration in our business. And that's where we stand today."
4. Lorillard's 1953 annual report told its shareholders: "[w]e believe Lorillard products are not injurious to anyone's health, but that we accept as an inherent responsibility of our corporate citizenship the obligation to make the public's health our business."
5. In 1971, Joseph Cullman III, the Chairman and Chief Executive Officer of Philip Morris, appeared on Face

the Nation on CBS and stated, "when as and if any ingredient in cigarette smoke is identified as being injurious to human health we are confident that we can eliminate that ingredient."

6. Internally, the tobacco industry recognized it assumed a duty to inform the public of hazards associated with cigarettes. On April 4, 1978, Ernest Pepples, General Counsel for B&W, sent a letter to J.E. Edens at B&W Industries describing the purpose of the CTR and its statements to the public: "Originally, the CTR was organized as a public relations effort. The industry told the world CTR would look at the diseases which were being associated with smoking. *There was even a suggestion by our political spokesmen that if a harmful element turned up the industry would try to root it out. The manufacturer has a duty to know its product...*" (Emphasis added).

7. Horace Kornegay, President and Executive Director of the Tobacco Institute, stated on the NBC Today Show on January 10, 1979, stated "if we know what the criminal element is...then every effort will be

made to remove it from the product."

8. R.J. Reynolds' president Gerald H Long, in a May 19, 1986, interview for Insight Magazine, asserted that if he ever "saw or thought there were any evidence whatsoever that conclusively proved that, in some way, tobacco was harmful to people, and I believed it in my heart and my soul, then I would get out of the business."

c. In 1962, The Tobacco Institute, the public relations successor to the TIRC, began to publish many advertisements, including one entitled "Some frank words about Smoking and Research," which stated in part:

1. "Most scientists recognized long ago that there are no simple, easy answers in cancer research. They know that the answers to fundamental questions about causation can come about only through persistent scientific research."

2. "The tobacco industry supports and cooperates with all responsible efforts to find the facts and bring them to the public"

3. "In that spirit, we are cooperating with the U.S. Surgeon General and his special study group

appointed to evaluate presently available research knowledge. Similar cooperation has been offered to the American Medical Association's proposed study."

4. We know we have a special responsibility to help scientists determine the facts about tobacco use and health."

5. "The industry accepted this responsibility in 1954 by establishing the Tobacco Industry Research Committee to provide research grants to scientists in recognized research institutions. This research program is continuing on an expanded and intensified scale."

d. In 1966, the Tobacco Institute issued a press release where it stated on behalf of the tobacco industry: "Scientists throughout the world are continuing to investigate to learn the full facts about 'tar' and nicotine, and about questions concerning tobacco and health. The tobacco industry is supporting much of this research and will continue to do so."

e. The TIRC was formed in 1954 by cigarette manufacturers, including R.J. Reynolds and Philip Morris, with the pledge to provide aid and assistance to the research into all phases of cigarette use and health, expressly undertaking an interest in

health as their basic responsibility paramount to every other consideration thereby affirmatively assuming a duty to disclose any adverse information regarding the health hazards of smoking. However, despite these promises, the TIRC and later CTR, concealed information regarding the lack of bona fide research being done on the health hazards of smoking, and the lack of funds being provided for research by the TIRC and CTR into the health hazards of cigarettes. Joint industry efforts undertaken by the TIRC and the CTR were neither disinterested nor objective. Tobacco industry documents, recently revealed, show that CTR functioned not for the promotion of scientific goals, but for the purposes of public relations, politics, and positioning for litigation. The TIRC and CTR were used to support an industry strategy of denying or creating doubt that smoking causes disease.

f. The tobacco industry and its organizations invested an enormous amount of time, effort, and money to curate a decades-long promise, which instilled a false belief in the public that R.J. Reynolds, Philip Morris, and fellow cigarette makers proactively sought the truth regarding smoking's health hazards and would discontinue a product that they knew to be cancer-causing. This false belief was passed down, overtly or implicitly, from adults to children through generations of American consumers, including Plaintiffs.

178. In making the aforementioned half-truths, suppressing the totality of material facts and passing them off as the entirety of the truth regarding what it knew about the health consequences of smoking and the addictive nature of cigarettes, R.J. Reynolds and Philip Morris also created a duty to disclose all material information in their possession.

179. Due to R.J. Reynold' and Philip Morris' superior position, assumption of duty, and creation of a duty to disclose all material information, Plaintiffs placed their trust and confidence in R.J. Reynolds and Philip Morris to disclose all of the harmful effects of its cigarettes. Plaintiffs and others similarly situated justifiably relied upon the cigarette manufacturers, including the R.J. Reynolds and Philip Morris, the TIRC, and the CTR to disseminate knowledge and information which they possessed regarding the health hazards of cigarettes, especially after the industry chose to voluntarily speak regarding its cigarette products, efforts to support research into the harms and addictive nature of smoking, ensuring the public it would disclose and remove any harmful elements of tobacco smoke it discovered, and even remove cigarettes from the market or stop business if it found them harmful to human health. Plaintiffs also reasonably and justifiably relied on R.J. Reynolds and Philip Morris to disclose information including but not limited to the fact that smoking causes cancer, that the nicotine level designed into each of R.J. Reynolds' and Philip Morris' cigarettes would cause strong addiction, and that filter, low-tar and mild cigarette designs do not actually reduce the risk of smoking.

180. However, rather than disclosing the truth, R.J. Reynolds, Philip Morris, other cigarette makers, TIRC, and TI collectively undertook a misinformation campaign to fraudulently induce the public and Plaintiffs to believe that they were in favor of protecting consumers' health, and that the issues of nicotine addictiveness and the carcinogenic nature of tobacco were unproven by scientific research.

181. Beginning at an exact time unknown to Plaintiffs and continuing even today, the cigarette manufacturers, including R.J. Reynolds and Philip Morris, have carried out, and continue to carry out a campaign designed to deceive the public, Plaintiffs, physicians, the government, and others as to the true dangers of smoking cigarettes. R.J. Reynolds and Philip Morris and other cigarette manufacturers carried out such scheme by concealing their knowledge concerning the following material information:

a. The results of their own research into the health dangers posed by smoking cigarettes, including but not limited to the results of mouse skin painting experiments which proved that Defendants' cigarettes did in fact contain carcinogenic materials;

b. Their failure to conduct adequate testing to determine whether cigarette smoking did lead to cancer and other diseases;

c. The importance of animal experiments in determining the ability of cigarettes to cause disease in humans;

d. The importance of epidemiological evidence in determining the ability of cigarettes to cause disease in humans;

e. The addictive and dependence producing nature of nicotine as contained in cigarette smoke;

f. The risks of contracting cancer, including but not limited to laryngeal cancer, lung cancer, esophageal cancer, other head and neck cancers, tongue/oral cavity cancer, bladder cancer and other forms of cancer, from smoking cigarettes;

g. The dose-response relationship between various carcinogenic substances contained in cigarette smoke and the risk of contracting cancer, including but not limited to lung cancer;

h. That reducing the number of cigarette smoked per day would greatly reduce the risk of contracting a cigarette related disease;

i. That smoking in excess of 5 cigarettes per day would likely lead to an addiction to or dependence on nicotine;

j. The use of ammonia technology and/or certain tobacco blends to boost the ph of the cigarette smoke so as to increase the ratio of the "free base" form of nicotine (which is more easily absorbed by the smoker) to the acid salt form of nicotine (which is less readily absorbed) so as to allow for greater absorption of nicotine by the smoker at lower levels of total dose;

k. The use of tobacco high in nitrosamines, a potent carcinogen not found in green tobacco leaf but created during the tobacco curing process;

l. The lack of credible scientific studies linking other human endeavors such as air pollution, viruses and/or road tar to the increasing rate of lung cancer in this country;

m. That cessation of smoking, while reducing the risk of contracting certain cigarette related diseases, does not eliminate all risk;

n. That cigarette smoking permanently alters certain receptor cites in the brain for nicotine making it more likely such individual will become or continue to be addicted to and/or dependent upon nicotine;

o. That use of mild tobaccos, re-constituted tobacco, tobacco casings and flavorants in the manufacture of R.J. Reynolds' and Philip Morris' cigarettes led to a cigarette less likely to trigger the smoker's own biological self defense mechanisms, the smoke of which was easier to inhale, inhale more deeply, and hold in the lungs for a longer period of time, which resulted in increased doses of carcinogens, such as PAHs and nitrosamines, and nicotine for the smoker even at lower levels of machine measured tar and nicotine yields;

p. That smoke from R.J. Reynolds' and Philip Morris' cigarette products caused damage to a smoker's respiratory tract, including but not limited to the ciliary escalator system utilized by the body to remove foreign particles from the lungs, increasing the risk of

the smoker of contracting various respiratory ailments including but not limited to lung cancer, bronchitis and pneumonia;

q. That the carcinogens in cigarette smoke lead to the development of genetic mutations within the lungs of smokers making such smokers more likely to develop lung cancer when exposed to carcinogens, tumor promoters, and/or tumor initiators, including but not limited to those such as PAHs and nitrosamines found within cigarette smoke.

r. That switching to filtered, low tar, low nicotine and/or "Light" cigarettes would not be less hazardous because smokers would smoke more and/or alter their smoking habits such that their intake of tar, nicotine, and other harmful substances would not be reduced;

s. By continuing even today to fraudulently market and sell multiple brands as "filtered," causing smokers to wrongly believe that filtered cigarettes reduce the harms of smoking based on the implication of filtration of smoke and therefore relative safety compared to unfiltered cigarettes. However, R.J. Reynolds, Philip Morris, and the industry know filtered cigarettes provide no health benefit, as proven by numerous reliable epidemiologic studies that have shown that filtered cigarettes are no safer than non-filtered cigarettes; and/or

t. That the Federal Trade Commission ("FTC") method of measuring "tar & nicotine" levels underestimated and did not accurately reflect the levels of tar and nicotine actually delivered to an actual smoker.

182. The cigarette manufacturers, including R.J. Reynolds and Philip Morris, have concealed vast amounts of knowledge regarding the health hazards of cigarettes and their addictive nature over the course of the last 65 years. Plaintiffs are unable to allege in full all such knowledge that the cigarette manufacturers and their co-conspirators, THE TOBACCO INSTITUTE, INC. ("TI") formed in 1958, TOBACCO INDUSTRY RESEARCH COMMITTEE ("TIRC") formed in 1954, and COUNCIL for TOBACCO RESEARCH ("CTR") formed in 1964 and previously known as the TIRC, as well as attorneys and law firms retained by R.J. Reynolds and Philip Morris and have withheld and/or failed to release over the last almost 65 years, both because Plaintiffs do not have access to this information, and because to allege each and every such concealment of material fact herein would entail hundreds or even thousands of pages of pleadings; indeed, it is the cigarette manufacturers themselves, including R.J. Reynolds and Philip Morris, which have this knowledge and information, and are in the best position to know the contents of each and every such concealed fact.

183. The cigarette manufacturers, including R.J. Reynolds and Philip Morris, concealed their actual knowledge concerning their own negative health and addiction research results and their manipulation and control of the nicotine content of their products to induce the public, including Plaintiffs, to smoke, and create and

perpetuate smokers' addiction to cigarettes. The success of the conspiracy depended upon the concerted action of the cigarette manufacturers (in a so-called "gentleman's agreement"), for otherwise the revelation by one company of what it knew about the health consequences of smoking and/or the availability of a "safe" or "safer" cigarette and/or the addictive nature of the manufacturers' cigarettes would have thwarted the conspiracy.

184. As early as 1953, Dr. Ernst Wydner had published an article titled Experimental Production of Carcinoma with Cigarette Tar in the journal Cancer Research. In his experiments, he painted cigarette tar on the backs of mice which then developed tumors on their backs. In 1954, a tobacco manufacturer, assuming that whatever cigarettes were used in Dr. Wydner's study were not CHESTERFIELD or L & M, decided to repeat Dr. Wydner's experiments with their cigarettes with, hopefully, better results. In a 1954 memo written by F. R. Darkis, an executive for a tobacco manufacturer, Mr. Darkis writes:

> If Chesterfield turn out to be negative, and X (used by Wydner) as positive, it would then be possible to say, that by using Dr. Wydner's techniques, Chesterfield did not produce cancer in mice.

Of course, when the experiments were finished in 1955, the mice had developed tumors and so had rabbits that were similarly tested. The results of these experiments would not become public until many years later.

185. A confidential "limited" tobacco manufacturer document dated March 15, 1961 (L&M - A Perspective Review), reads in part:

a. There are biologically active materials present in cigarette smoke. These are a) cancer causing b) cancer producing, c) poisonous ...

b. What the causative precursors in tobacco are is not well known...So there is the suggestion of two mechanisms for causative agent products...but what good is this? We've known this for several years - so what?

186. This document was written by a tobacco industry consultant for a tobacco manufacturer. This industry consultant conducted animal research from 1954-1984 for a tobacco manufacturer. This memo contained material facts known to and concealed by R.J. Reynolds and Philip Morris since at least 1961 and unknown to Plaintiffs.

187. In 1964, TIRC changed its name to CTR, and was joined by Other tobacco manufacturers. Defendants R.J. Reynolds Tobacco Company and Philip Morris USA, Inc. were founding members of the TIRC/CTR. The TIRC had been formed in 1954 with the pledge to provide aid and assistance to the research into all phases of cigarette use and health, expressly undertaking an interest in health as their basic responsibility paramount to every other consideration thereby affirmatively assuming a duty to disclose any adverse information regarding the health hazards of smoking.

188. Despite their "promise" which created the illusion that scientific research into the dangers of smoking was being conducted, the results of which would

be made public, they concealed information regarding the lack of bona fide research being done by the TIRC and CTR into the health hazards of smoking, and the lack of funds being provided for research by the TIRC and CTR into the health hazards of cigarettes, which was the purported purpose for which the TIRC and CTR were established.

189. Joint industry efforts undertaken by the TIRC and the CTR were neither disinterested nor objective. Industry documents, recently revealed, show that CTR functioned not for the promotion of scientific goals, but for the purposes of public relations, politics, and positioning for litigation. The TIRC and CTR were used to support an industry strategy of denying or creating doubt that smoking causes disease. This material information was concealed from Plaintiff and the public. For example, in 1967, G.F. Todd of the CTR wrote a letter to Mr. Addison Yeaman. Mr. Yeaman was the vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY. In his letter, Todd observed:

> The only real difficulties that we encountered arose out of the unavoidable paradox at the center of our operations - namely that, on the one hand the manufacturers control TIRC's operations and do not accept that smoking has been proved to cause lung cancer while, on the other hand, TIRC's research program is based on the working hypothesis that this has been sufficiently proved for research purposes. In addition, the Council senior scientists accept

> the causation theory...We have not yet found the best way of handling this paradox.

190. In a July 17, 1963, memo Addison Yeaman, vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY and later president and CEO of the CTR writes:

> The TIRC cannot, in my opinion, provide the vehicle for such research (discover the carcinogens in cigarette smoke). It was conceived as a public relations gesture and ... it has functioned as a public "relations operation."

Clearly, despite what the industry had publicly represented as being the purpose for which the TIRC and later CTR were formed, industry insiders knew it was nothing more than a "public relations" sham.

191. In that same July 17, 1963, memo Addison Yeaman, vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY and later president and CEO of the CTR writes:

> Moreover, nicotine is addictive. We are, then in the business of selling nicotine, an addictive drug effective in the release of stress mechanisms ... But cigarettes - we assume the Surgeon General's Committee to say - despite the beneficent effect of nicotine, have certain unattractive side effects:
>
> 1) They cause, or predispose to, lung cancer.

2) They contribute to certain cardiovascular disorders.

3) They may well be truly causative in emphysema, etc, etc.

192. The 1964 Surgeon General's Report was not issued for another six months. The 1964 Report did not have sufficient evidence to conclude that nicotine was addictive, but the cigarette industry certainly did. The industry also understood what the findings of the Surgeon General would be regarding causation and disease even before those findings were made public. Despite what the industry told the public the industry clearly understood that nicotine was addictive, and cigarettes were a cause of lung cancer and other diseases.

193. The cigarette manufacturers, including Defendants herein, knew for decades that the "tar and nicotine levels," as measured by the so-called Cambridge Filter Method or FTC method, were inaccurate – and seriously underestimated the levels of poisons delivered into the lungs. Yet they continued to tout the tar and nicotine numbers on cigarette packs and marketing materials, inducing smokers to believe lower tar and lower nicotine cigarettes were safer, until 2008 when the Federal Trade Commission ultimately rescinded its guidance concerning tar and nicotine yields.

194. The cigarette manufacturers, including R.J. Reynolds and Philip Morris, continue even today to fraudulently market and sell multiple brands as "filtered," knowing that smokers wrongly believe that filtered cigarettes reduce the

harms of smoking and despite knowing internally that such cigarettes are just as addictive, dangerous, and deadly as non-filtered cigarettes.

195. Due to the above misconduct, Plaintiffs could not have discovered the truth about cigarettes and were prevented from making a reasonable inquiry. Plaintiffs did not have access to R.J. Reynolds' and Philip Morris' research, information, and/or knowledge about the true dangers of the cigarette products that were concealed, hidden, and/or suppressed by R.J. Reynolds, Philip Morris, and their co-conspirators, did not have the resources or ability to perform such research or otherwise learn this information, and could not have discovered through reasonable diligence the information about the true dangers of cigarettes that was known and concealed by R.J. Reynolds and Philip Morris.

196. As a result, when Plaintiffs began and continued to smoke R.J. Reynolds' and Philip Morris' cigarettes, they were not told the material information listed above.

197. R.J. Reynolds and Philip Morris withheld and concealed the materially factual information to induce Plaintiffs and others to falsely believe that cigarettes were not dangerous and to induce them to smoke and become addicted to the nicotine in their cigarette products.

198. Plaintiffs justifiably relied upon R.J. Reynolds' and Philip Morris' fraudulent concealment of the materially actual information to believe that cigarettes were not in fact addictive and that they were not harmful.

199. Had R.J. Reynolds and Philip Morris not for many years concealed and/or suppressed its knowledge of the dangers of their cigarette products (or spread false information designed to cause confusion) from Plaintiffs and the public, including that the products caused cancer and other serious health issues, Plaintiffs would not have started smoking, or stopped earlier and Plaintiffs' risk of injury from cigarettes, including lung cancer and COPD, would have been eliminated.

200. Had R.J. Reynolds and Philip Morris not concealed and/or suppressed their knowledge of the addictiveness of its cigarette products from Plaintiffs and the public, Plaintiffs would not have started smoking or would have stopped smoking at an earlier age or significantly reduced their cigarette intake, and their risk of injury from cigarettes, including Plaintiffs' illnesses, diseases and/or cancers, would have been reduced or eliminated.

201. As a direct and proximate result of the aforementioned concealment and/or suppression of material information by the cigarette manufacturers, including R.J. Reynolds and Philip Morris and their co-conspirators, Plaintiffs smoked and/or continued to smoke and were otherwise exposed to R.J. Reynolds' and Philip Morris' cigarette products, which caused or contributed to cause Plaintiffs to develop injuries, including but not limited to Plaintiffs' illnesses, diseases and/or cancers, in addition to other related physical conditions which resulted in and directly caused them to suffer severe bodily injuries.

WHEREFORE, Plaintiffs pray for judgment against Defendants R.J. Reynolds and Philip Morris for compensatory damages in an amount in excess of

FIFTY THOUSAND DOLLARS ($50,000.00) plus costs of suit, pre-judgment interest, and for any and all such other further relief as this Court deems just and appropriate.

**COUNT 3: CONSPIRACY TO COMMIT FRAUDULENT CONCEALMENT (R.J. Reynolds, Philip Morris, and Walgreens)**

202. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

203. In addition to the preceding allegations, Walgreens knowingly joined, aided, abetted, and substantially assisted the tobacco industry's conspiracy to conceal material facts about cigarettes, nicotine addiction, secondhand smoke, and smoking-related disease.

204. At all times material Walgreen Co., promoted, aided and abetted the Tobacco Industry to help spread the Tobacco Industry's fraud, misrepresentation and lies. Walgreens was one of the largest stores and pharmacies in Illinois and Walgreens used its reputation as a service provided for health supplies and medication to sell cigarettes, directly implying that cigarettes were healthy and not harmful.

205. Walgreens had regular correspondence with the Tobacco Institute, which was the fraud and conspiracy center for the Tobacco Industry, including R.J. Reynolds and Philip Morris, whose sole purpose was to coordinate lying to and deceiving the American Public.

206. Walgreens was an active coconspirator who aided and abetted the Tobacco Institute and by proxy R.J. Reynolds and Philip Morris as other coconspirators in their fraud, misrepresentation, lies and deception of the American

public as to cigarette smoke and nicotine to aid and abet the Tobacco Industry's false and fraudulent pro-cigarette smoke messages.

207. Walgreens continued to work with the tobacco industry selling cigarettes even though Walgreens advertised itself as a health care center. Walgreens had a particularly close relationship with Philip Morris sharing a confidential Joint Business Plan and Joint Operations Manual to maximize cigarette sales using promotions, coupons, and using Walgreen's trusted name. Behind prescriptions, drugs, and toiletries, cigarettes sales was the fourth largest revenue drivers for Walgreens.

208. Walgreens' role in the concealment conspiracy began no later than the 1970s, when Walgreens communicated with the Tobacco Institute about how Walgreens could assist the Tobacco Industry in responding to public health concerns about smoking and cancer. Walgreens knew that the Tobacco Institute and the cigarette manufacturers were publicly maintaining a false controversy over smoking and health, yet Walgreens explored how it could help both Walgreens and the tobacco industry, including R.J. Reynolds and Philip Morris, by using Walgreens' status as an established health center to gain public support.

209. Walgreens' March 1977 communications with the Tobacco Institute were overt acts in furtherance of the concealment conspiracy. Walgreens sought Tobacco Institute guidance for an information program that would help the tobacco industry and Walgreens; the Tobacco Institute internally described Walgreens as having a real interest in being of assistance to the tobacco industry in

getting the industry's message to the public; and the Tobacco Institute responded by providing public-relations materials and discussing how major tobacco-company sales offices had distributed similar materials.

210. Walgreens later continued the conspiracy through its confidential and coordinated commercial relationship with Philip Morris. Walgreens and Philip Morris coordinated cigarette merchandising, promotions, fixtures, plan-o-grams, price call-outs, payments, district-level contacts, store-level execution, and Retail Masters compliance in Walgreens stores.

211. Walgreens' pharmacy and heath care reputation made its cooperation especially valuable to the Tobacco Industry. By selling and promoting cigarettes in a trusted heath care retail setting, Walgreens helped conceal the true nature of cigarettes as addictive, defective, carcinogenic products and helped normalize the tobacco industry's false message that cigarettes were ordinary consumer goods whose risks were uncertain, disputed, or manageable.

212. Walgreens acted with knowledge of, or reckless disregard for, the tobacco industry's concealment of material facts and with the intent that consumers, including Plaintiffs, continue to purchase, smoke, and be exposed to cigarettes without knowing the full truth about cigarette hazards, nicotine addiction, secondhand smoke, filtered and low-tar cigarettes, and the disease risks caused by cigarette smoke.

213. The Defendants, along with other tobacco manufacturers, the Tobacco Industry Research Committee (TIRC), the Council for Tobacco Research

(CTR), and Tobacco Institute (TI), along with attorneys and law firms retained by R.J. Reynolds and Philip Morris unlawfully agreed to conceal or omit, and did in fact conceal or omit, information regarding the health effects of cigarettes and or their addictive nature with the intention that smokers and the public would rely on this information to their detriment. Defendants agreed to execute their scheme by performing the above-mentioned unlawful acts and/or by doing lawful acts by unlawful means.

214. Defendants along with other entities, including the TIRC/CTR, TI, and persons including their in-house lawyers and outside retained counsel, entered into a conspiracy in the 1950s to conceal the harms of smoking cigarettes.

215. Defendants, through their employees, agents and, representative made numerous public statements from 1953 through 2000 directly denying the actual health harms and addictive nature of smoking cigarettes.

216. During its four decade history, the TIRC/CTR never acknowledged that smoking had been proven to be a cause of multiple cancer types or other serious diseases in smokers, the addictive nature of nicotine, and the fact that light cigarettes are no safer than regular cigarettes, even though the vast majority of CTR funded scientists themselves believed that cigarette smoking was responsible for a wide range of serious, and often fatal injuries, including multiple cancers, understood the addictive nature of nicotine and also knew that light cigarettes were no safer than regular cigarettes.

217. After the year 2000, Defendants and their co-conspirators continued their conspiratorial acts in furtherance of the conspiracy related to the harms of smoking, including but not limited to the following acts:

a. Marketing and/or advertising filters as safer or less hazardous to health than non-filtered cigarettes;

b. Marketing and/or advertising low tar cigarettes as safer or less hazardous to health;

c. Marketing and/or advertising lights and ultra-lights cigarettes as safer or less hazardous to health;

d. Continuing to market and/or advertise lights, ultra-lights, and low tar cigarettes under color brand name descriptors such as "Gold" and "Silver" and informing smokers "pack will be changing, but your cigarette will stay the same" following the federal ban on the use of "lights," "mild," and "low" tar descriptors in 2010; and

e. Knowingly concealing from the public that filtered, low tar, lights and ultra-lights cigarettes were no safer or even less hazardous that other cigarettes.

218. Defendants' and their co-conspirators' conduct as it relates to their acts in furtherance of their conspiracy as alleged in this Complaint continues through the present.

219. The concealed and omitted information described in the preceding paragraphs was material information.

220. Plaintiffs relied both directly and indirectly to their detriment upon the Defendants' and other co-conspirators' concealment and omission of such material information. Plaintiffs, during the course of Plaintiffs' smoking history, heard some or all these false and misleading statements and/or similar statements made directly or indirectly by the Defendants and/or their co-conspirators, believed some or all of the Defendants' and their co-conspirators' false and misleading statements, and relied to their detriment by smoking and continuing to smoke based on such false and misleading statements.

221. Had Defendants and their co-conspirators not concealed and omitted the aforementioned information from Plaintiffs and the public, Plaintiffs would have not started smoking, and/or reduced the number of cigarettes, and/or stopped smoking at an earlier age, and their risk of injury from cigarettes would have been reduced or eliminated.

222. Each Defendant's acts and omissions, and those of TIRC/CTR, TI, and other tobacco manufacturers, as well as their in-house and retained counsel, constitute a successful conspiracy to commit fraud.

223. Conspiracy is but a vehicle for imputing the tortious acts of one co-conspirator to another. Each act done in pursuance of a conspiracy by one of several conspirators is an act for which each is jointly and severally liable. Once the existence of a conspiracy is established and a party's membership in the conspiracy is established, that party will be liable for the acts of all members of the conspiracy in furtherance of the conspiracy regardless of the nature of its own actions. One who knowingly joins a

conspiracy, even at a later date, takes the conspiracy as they find it and is liable for all acts previously or subsequently done in pursuance of the conspiracy. Accordingly, Defendants, as members of a civil conspiracy, are liable for all acts and/or omissions of any co-conspirator done in pursuance of the conspiracy.

224. As a direct and proximate result of the fraudulent concealment of the aforementioned conspiracy to conceal and/or suppress material information by the cigarette manufacturers, including Defendants and their co-conspirators, Plaintiffs smoked, continued to smoke, and/or were otherwise exposed to Defendants' cigarette products, which caused or contributed to cause injuries, including but not limited to Plaintiffs' illnesses, diseases, and/or cancers, in addition to other related physical conditions, which resulted in and directly caused or contributed to cause Plaintiffs to suffer severe bodily injuries.

WHEREFORE, Plaintiffs pray for judgment against Defendants R.J. Reynolds, Philip Morris, and Walgreens for compensatory damages in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs of suit, pre-judgment interest and for any and all such other further relief as this Court deems just and appropriate.

**COUNT 4: CONSPIRACY TO COMMIT FRAUDULENT MISREPRESENTATION**
**(R.J. Reynolds, Philip Morris, and Walgreens)**

225. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

226. In addition to the preceding allegations, Walgreens knowingly joined, aided, abetted, and substantially assisted the tobacco industry's conspiracy to make and disseminate false and misleading statements about cigarettes, nicotine addiction, secondhand smoke, and smoking-related disease.

227. Walgreens' role in the misrepresentation conspiracy began no later than the 1970s, when Walgreens communicated with the Tobacco Institute about how Walgreens could assist the tobacco industry in the public smoking-and-health controversy. Walgreens expressly invoked its status as an established health center and sought guidance from the Tobacco Institute concerning an information program that would help both Walgreens and the tobacco industry.

228. The Tobacco Institute understood Walgreens' approach as an opportunity for Walgreens to help the tobacco industry get the industry's message to the public. The Tobacco Institute thanked Walgreens for its interest in pitching in to defend tobacco customers and provided materials from a prior industry-funded public-relations effort. Walgreens thereby aided the Tobacco Institute and the cigarette manufacturers in spreading false and misleading pro-cigarette messaging through a retail pharmacy channel that appeared more credible to ordinary consumers than direct cigarette-company advertising alone.

229. Walgreens also aided the misrepresentation conspiracy by coordinating with Philip Morris through confidential operations manuals, account plans, and business plans designed to increase cigarette sales and profitability in Walgreens stores. Those materials show coordinated use of promotions, Flex Funds,

price call-outs, merchandising, fixtures, plan-o-grams, store-level compliance, and Walgreens' district/store management structure to increase cigarette sales and maintain cigarette visibility.

230. Walgreens' participation was not incidental. Philip Morris' Walgreens-specific materials identified Walgreens' heath care-provider mission, major national retail footprint, millions of daily customers, and tobacco category sales, while proposing tactics to increase cigarette sales and profitability. Walgreens' conduct thus supplied the Tobacco Industry with both a trusted heath care retail setting and a national point-of-sale channel for continued cigarette promotion.

231. By using its stores, reputation, and promotional systems to sell and promote cigarettes while the tobacco industry falsely represented and implied that cigarette risks were uncertain, disputed, or reduced by filters, light cigarettes, or low-tar designs, Walgreens substantially assisted the tobacco industry's fraudulent misrepresentations and intended that consumers, including Plaintiffs, would rely directly or indirectly on those misrepresentations and continue smoking or fail to quit.

232. Defendants, along with the other cigarette manufacturers referenced above, the Tobacco Industry Research Committee (TIRC), the Council for Tobacco Research (CTR), and Tobacco Institute (TI), along with attorneys and law firms retained by R.J. Reynolds and Philip Morris, unlawfully agreed to commit, and did commit, overt acts, false statements, and/or fraudulent misrepresentations concerning information regarding the health effects of cigarettes or their addictive

nature with the intention that smokers and the public would rely on this information to their detriment. Defendants agreed to execute the scheme by performing the above-mentioned unlawful acts and/or by doing lawful acts by unlawful means.

233. During its four-decade history, the TIRC/CTR never acknowledged that smoking had been proven to be a cause of cancer or other serious diseases in smokers while maintaining publicly that smoking had not been proven to cause disease, even though the vast majority of CTR-funded scientists themselves believed that cigarette smoking was responsible for a wide range of serious, and often, fatal diseases.

234. The acts, false statements, and/or fraudulent misrepresentations described in the preceding paragraphs were material information.

235. Plaintiffs relied to their detriment upon the acts, false statements, and/or fraudulent misrepresentations of such information. Plaintiffs, during the course of their smoking history, were exposed to, saw, read, and/or heard some or all the false or misleading statements and/or similar statements made directly or indirectly by Defendants and their co-conspirators, believed some or all of the Defendants' and their co-conspirators' false or misleading statements, and relied to their detriment and continued to smoke cigarettes based on such false or misleading statements.

236. Had Defendants or their co-conspirators not made the aforementioned false statements and fraudulent misrepresentations of such information to Plaintiffs, Plaintiffs would have reduced the number of cigarettes that

they consumed and/or stopped smoking at an earlier age, and their risk of injury from cigarettes, including lung cancer, would have been reduced or eliminated.

237. Defendants' acts and omissions, and those of the CTR, TIRC and TI, and other cigarette manufacturers, and in-house lawyers and outside retained counsel, constitute a successful conspiracy to commit fraudulent misrepresentation.

238. Conspiracy is but a vehicle for imputing the tortious acts of one co-conspirator to another. Each act done in pursuance of a conspiracy by one of several conspirators is an act for which each is jointly and severally liable. Once the existence of a conspiracy is established, and a party's membership in the conspiracy is established, that party will be liable for the acts of all members of the conspiracy in furtherance of the conspiracy regardless of the nature of his own actions. One who knowingly joins a conspiracy, even at a later date, takes the conspiracy as he/she/it finds it and is liable for all acts previously or subsequently done in pursuance of the conspiracy. Accordingly, each Defendant as a member of a civil conspiracy is liable for all acts and/or omissions of any co-conspirator done in pursuance of the conspiracy.

239. As a direct and proximate result of the aforementioned conspiracy to commit acts and make false statement, and/or fraudulent misrepresentations by the cigarette manufacturers, including Defendants and their co-conspirators, Plaintiffs continued to smoke and/or were otherwise exposed to cigarette products, which caused them to develop injuries, including but not limited Plaintiffs' illnesses, diseases, and/or cancers, in addition to other related physical conditions which resulted in and directly caused or contributed to cause Plaintiff's to suffer severe bodily injuries.

WHEREFORE, Plaintiffs pray for judgment against Defendants R.J. Reynolds, Philip Morris, and Walgreens for compensatory damages in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs of suit, pre-judgment interest, and for any and all such other further relief as this Court deems just and appropriate.

**COUNT 5: STRICT LIABILITY: DESIGN DEFECT**
**(R.J. Reynolds, Philip Morris, and Walgreens)**

240. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

241. Defendants were and have been designers, manufacturers, advertisers, distributors, and/or sellers of cigarette products, including but not limited to the R.J. Reynolds' and Philip Morris' brand cigarette products Plaintiffs smoked, as alleged above.

242. The products complained of were cigarette products designed, manufactured, advertised, distributed, and/or sold by Defendants and used by and/or in the vicinity of Plaintiffs.

243. The aforesaid products were distributed, supplied, sold, and/or otherwise placed into the stream of commerce and/or caused to be placed into the stream of commerce by the Defendants.

244. Plaintiffs were exposed to Defendants' cigarette products over many years, during which time smoke from Defendants' cigarette products were inhaled by Plaintiffs, which caused or contributed to cause Plaintiffs to develop their illnesses, diseases, and/or cancers, and/or other injuries.

245. At the time Defendants designed, manufactured, advertised, marketed, distributed, and/or sold the aforesaid cigarette products, such products were expected to, and did, reach Plaintiffs in a condition without substantial change from that in which such products were when within the possession of Defendants.

246. The Defendants' cigarette products were in a condition unreasonably dangerous to users and/or bystanders, such as Plaintiffs, and said products were expected to, and did, reach Plaintiffs without substantial change affecting that condition.

247. Defendants' cigarette products were, by reason of their design, in a condition unreasonably dangerous to users and/or bystanders, such as Plaintiffs, and said products were expected to, and did, reach Plaintiffs without substantial change affecting that condition.

248. Defendants' cigarette products were in a defective condition, unreasonably dangerous, in that those products:

a. by design contained tar, nicotine, carcinogens, toxic gasses, and other substances deleterious, poisonous, and highly harmful to Plaintiffs;

b. contained tar, nicotine, carcinogens, toxic gasses, and other substances deleterious, poisonous, and highly harmful when and after it became feasible to design and manufacture reasonably comparable products not containing those substances or containing less of them;

c. failed to filter the harmful substances so that during ordinary use, such materials would not be liberated into the air and/or breathed by smokers, such as Plaintiffs;

d. through the use of filters, manufacturing methods, engineering methods, and/or materials utilized, were designed in such a way to make smoking Defendants' cigarette products more tasteful, pleasurable, and less likely to trigger the smoker's own biological self defense mechanisms which otherwise may have limited and/or altered the smoker's behavior in such a way that the smoker may have smoked less, inhaled less deeply or not at all;

e. utilized tobacco and/or re-constituted tobacco that was high in nitrosamines, nitrates, nicotine, carcinogens, and other substances deleterious, poisonous, and highly harmful when alternative, less dangerous, materials were available to be used in the manufacturing process;

f. in the nature and degree of the danger of the products posed, were beyond the expectation of the ordinary consumer when used as intended or in a reasonably foreseeable manner;

g. by designing and manufacturing their cigarettes to be inhalable and thus unreasonably dangerous; and/or

h. by placing additives and ingredients in cigarettes to making them easier to inhale and addictive.

249. Plaintiffs, unaware of the defective and unreasonably dangerous condition of the Defendants' cigarette products, and at a time when such products were being used for the purposes for which they were intended, were exposed to and breathed smoke from Defendants' cigarette products.

250. Under a risk-benefit analysis, the foreseeable risks of Defendants' cigarette products outweighed any claimed utility or benefit of those products. The products delivered addictive nicotine, contained carcinogens, toxic gases, tar, nitrosamines, and other harmful substances, caused cancer, COPD, emphysema, cardiovascular disease, addiction, and death when used as intended or in a reasonably foreseeable manner, and were designed and promoted in ways that increased initiation, addiction, inhalation, continued use, and toxic exposure. Safer and less dangerous alternative designs, formulations, materials, manufacturing methods, nicotine-delivery levels, and product configurations were feasible and known to Defendants, including designs that would reduce or eliminate addictive nicotine delivery, reduce carcinogenic and toxic constituents, reduce inhalability, and avoid misleading filter/light/low-tar design features. The magnitude and probability of the foreseeable harm, the availability of safer alternatives, Defendants' superior knowledge of the defects, and the inability of ordinary consumers to discover or protect themselves from those defects rendered the products defective and unreasonably dangerous.

251. Defendants knew that their cigarette products would be used without inspection for defects and, by placing them on the market, represented that they would be safe.

252. Plaintiffs were unaware of the hazards and defects in the cigarette products of the Defendants: that exposure to said products would cause Plaintiffs to develop cigarette related disease(s), which made said products unsafe for use.

253. Plaintiffs were caused to contract Plaintiffs' illnesses, diseases, and/or cancers, in addition to other related physical conditions, which resulted in and directly caused or contributed to cause Plaintiffs to suffer severe bodily injuries.

254. At the time the cigarettes distributed and/or sold by Walgreens left the control of the manufacturer and entered Walgreens' chain of distribution and sale, those products were in the same defective and unreasonably dangerous condition alleged herein.

255. The cigarettes distributed and/or sold by Walgreens were in a defective condition and unreasonably dangerous in that they contained nicotine, tar, carcinogens, toxic gases, and other deleterious substances; were designed and sold in a manner that promoted addiction and repeated use; and were more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

256. Walgreens knew that the cigarettes it sold would be used by consumers such as Plaintiffs without any meaningful inspection for defects and, by

placing them into the stream of commerce, represented that such products were safe for ordinary consumer use.

257. Walgreens had actual knowledge, through its direct communications with tobacco manufacturers, industry materials, and its own health-related operations, that the cigarettes it sold were defectively designed and unreasonably dangerous in the very respects alleged herein, including their addictive nicotine delivery, carcinogenic composition, and the falsity of any claimed reduced-risk benefit from filtered, low-tar, or light cigarette designs.

258. Walgreens is not an innocent seller under 735 ILCS 5/2-621 because Walgreens had actual knowledge of the specific defects in the cigarette products that caused or contributed to cause Plaintiffs' injuries, including the products' addictive nicotine delivery, carcinogenic and toxic composition, defective filter, light, and low-tar designs, and unreasonable danger when used as intended or in a reasonably foreseeable manner. Walgreens' actual knowledge existed before and during its sale and promotion of cigarettes to Plaintiffs and the public, and Walgreens continued to place those defective and unreasonably dangerous products into the Illinois stream of commerce despite that knowledge.

259. Plaintiffs, unaware of the defective and unreasonably dangerous condition of the cigarettes sold by Walgreens, purchased, used, and/or were exposed to those products when they were being used for the purposes for which they were intended or in a reasonably foreseeable manner.

260. As a direct and proximate result of Defendants' defective and unreasonably dangerous cigarette products, Plaintiffs developed Plaintiffs' illnesses, diseases, and/or cancers, in addition to other related physical conditions, which resulted in and directly caused or contributed to cause Plaintiffs to suffer severe bodily injuries.

WHEREFORE, Plaintiffs pray for judgment against R.J. Reynolds, Philip Morris, and Walgreens in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs of suit, pre-judgment interest and for any and all such other further relief as this Court deems just and appropriate.

**COUNT 6: NEGLIGENCE**
**(Walgreens)**

261. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

262. At all relevant times, Plaintiffs were smokers who purchased and consumed cigarettes from Walgreens.

263. At all relevant times, Walgreens knew or should have known that each Plaintiff, as a member of the general public for whose use cigarettes were placed into commerce, would be likely to use cigarettes in the manner described in this Complaint.

264. At all relevant times, Walgreens knew or had reason to know of the dangers associated with the manner and circumstances of Plaintiffs' foreseeable use of cigarettes.

265. Tobacco products, such as cigarettes smoked and/or consumed by Plaintiffs, are not ordinary or innocuous products.

266. Cigarettes are dangerous and well recognized to cause the death of fifty percent of consumers who smoke them.

267. There is no other product in Walgreens' inventory that is more dangerous or kills more consumers than cigarettes. Walgreens had a broad range of knowledge about the components of cigarette smoke and how those components were unreasonably dangerous to its consumers, including that the components of cigarette smoke contain carcinogenic, toxic, and dangerous compounds.

268. At all relevant times, Walgreens had knowledge of the defective and unreasonably dangerous nature of the cigarettes it sells to its consumers that far exceeded the knowledge or awareness of the health risks of smoking known by reasonable consumers, including Plaintiffs.

269. At all relevant times, Walgreens knew or should have known that reasonable consumers, including Plaintiffs, did not have the knowledge about how cigarettes were defective that was possessed by Walgreens.

270. Walgreens only recently began disclosing its superior knowledge to the public, long after Plaintiffs had already been exposed to the defective and unreasonably dangerous cigarettes sold by Walgreens.

271. For example, Walgreens own website now details particular, specific, and scientific evidence of the dangerous components of the smoke from the cigarettes it sold.

272. Walgreens acknowledges that there are 7,000 chemicals in every puff of cigarette smoke from the cigarettes it sells to its consumers. These carcinogenic, toxic, and dangerous components in cigarette smoke are not generally known by the reasonable consumer.

a. Acetone

b. Arsenic,

c. Butane

d. Cadmium

e. Ammonia

f. Toluene and

g. Formaldehyde

273. Plaintiffs and other reasonable consumers would not have knowledge of these dangerous chemicals in cigarettes.

274. Walgreens acknowledges in its website that its knowledge is superior to that of its consumers and candidly admits that particular harms from smoking are not well known or recognized by its consumers. Walgreens' website acknowledged and/or acknowledges that **"Smoking affects you in more ways <u>than you know</u>..."**

275. Walgreens' website cited to many diseases not generally known to be caused by smoking cigarettes, including "[i]ncreased risk of cataracts and macular degeneration, which could lead to blindness...[r]isks of stroke, heart

disease...[i]ncreased risk of erectile dysfunction and damaged/decreased sperm, which can lead to infertility or genetic defects in offspring."

276. Walgreens' superior knowledge about the unreasonable dangers and defects of cigarettes arose in part from its close relationship with the tobacco industry. Walgreens was aware as of 1977 at the latest that the tobacco industry including the co-defendant cigarette manufacturers, had engaged in creating a "controversy" to dispute the harmful effects of tobacco products.

277. Walgreens was actively engaged with the tobacco industry and the industry's co-conspirator, the Tobacco Institute, as shown by correspondence between Walgreens and tobacco industry executives.

278. For example, Walgreens reached out to the tobacco industry in March 1977 to declare what one tobacco executive described as its "willingness to take part in the smoking and health controversy on the side of the tobacco industry." *See* Letter from J. Kendrick Wells, III to Horace R. Kornegay dated March 29, 1977, Bates Number 687020794.[2]

279. Walgreens's Manager of News and Information Services, David C. Carlson, wrote to the President of the Tobacco Institute, Horace R. Kornegay, to explore possibilities of using its role as a "health center" to gain support for the tobacco industry:

> As you know, we at Walgreens are exploring the possibilities of an information program which will help both the tobacco Industry

[2] Documents referenced by Bates Numbers can be accessed through UCSF Library and Center for Knowledge Management tobacco document archive located at https://www.industrydocumentslibrary.ucsf.edu/tobacco/.

and ourselves. We don't want to step into the middle of a raging controversy, but as an established "health center" there are many, many things we can do to gain and maintain the understanding and support of the public.

*See* Letter from to Horace R. Kornegay, dated March 16, 1977, Bates Number TIMN0083432.

280. Walgreens had a "real interest in being of every possible assistance" to the tobacco industry "in getting the true word put about." *See* Memorandum dated March 17, 1977, Bates Number TIMN0083434.

281. As further example of its close relationship with the tobacco industry and its involvement in selling what it knew to be defective and unreasonably dangerous cigarettes to the public, including Plaintiffs, when Walgreens became aware in 1993 of litigation involving the tobacco industry's defective cigarette products, it sought indemnification from each of the major cigarette manufacturers for future lawsuits against it. *See* Letter from David L. Grobart to Jackie Gilbert, dated June 2, 1993, Bates Number 2064877537.

282. Additionally, Walgreens was told directly by R.J. Reynolds personnel in 2008 that "[n]o tobacco product has been shown to be safe and without risks" and "[r]educing the diseases and deaths associated with the use of cigarettes serves public health goals and is in the best interest of consumers, manufacturers and society." *See* RJRT Presentation, Bates Number 557062850.

283. These and other contacts that Walgreens had with the tobacco industry, including the cigarette manufacturers, show that Walgreens was aware of the defective and unreasonably dangerous nature of cigarettes, and that its knowledge was superior to the knowledge of the general public, including Plaintiffs.

284. Indeed, Walgreens knew as early as the 1990s that its co-defendants manufactured less hazardous cigarette products, like denicotinized cigarettes, low nicotine cigarettes, and non-combustible cigarette products.

285. Walgreens chooses to continue selling defective cigarettes to the public despite industry standards and norms set by other national retailers, such as Target and CVS, and the majority of independent pharmacies and drugstores which have ceased cigarette sales.

286. Tobacco salès in pharmacies directly contradict the pharmacist's code of ethics, which states that pharmacists must be committed to the welfare of their patients and must act with honesty and integrity in professional relationships, avoid actions that compromise dedication to the best interests of their patients. *See* American Pharmacists Association Code of Ethics https://www.pharmacist.com/code-ethics (last accessed on April 14, 2026). Since 1971, the American Pharmaceutical Association position has recommended against the display and sale of cigarettes in pharmacies, which is in direct contradiction to the role of the pharmacy as a public health facility.

287. Walgreens is aware that smoking is the leading cause of death in the United States but chooses to ignore statistics to profit from the sale of defective cigarettes.

288. Walgreens continues to sell defective cigarettes to consumers like Plaintiffs in order to profit further on smoking cessation devices, such as nicotine replacement patches, gum and lozenges, as well as prescription nicotine replacement therapies, such as varenicline and bupropion.

289. At all relevant times, Walgreens had a duty to use reasonable care in placing into the stream of commerce, distributing, marketing, promoting, and selling only products which were reasonably safe for their intended use, and to refrain from selling any product which it knew or should have known was unreasonably dangerous and defective when put to the use for which it was designed, manufactured, distributed, marketed, and sold, and which posed an unreasonable threat of bodily harm to consumers, users, bystanders, and/or others when it knew or should have known that consumers and other users lacked such knowledge about the defects or dangerous conditions of the product.

290. In breach of this duty, Walgreens sold and continued to sell cigarettes to Plaintiffs and the general public cigarette products which it knew were defective and unreasonably dangerous.

291. Had Walgreens not sold to Plaintiffs cigarette products which it knew were defective and unreasonably dangerous, Plaintiffs would have not started smoking and/or smoked fewer cigarettes, and/or stopped smoking at an earlier age,

and Plaintiffs' risk of injury from cigarettes would have been reduced or possibly eliminated.

292. As a direct and proximate result of the negligence described herein, Plaintiffs developed injuries caused by the consumption of cigarette products purchased from Walgreens, including but not limited to Plaintiffs' illnesses, diseases, and/or cancers, in addition to other related physical conditions, which resulted in and directly caused or contributed to cause Plaintiffs to suffer severe bodily injuries. Plaintiffs have sustained bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity to lead and enjoy a normal life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a previously existing condition. The damages, injuries, and losses are permanent and continuing in nature, and Plaintiffs have suffered these losses.

WHEREFORE, Plaintiffs pray for judgment against the Walgreens in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs of suit, pre-judgment interest and for any and all such other further relief as this Court deems just and appropriate.

**COUNT 7: VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1 et seq.) (R.J. Reynolds and Philip Morris)**

293. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

294. At all relevant times, R.J. Reynolds and Philip Morris were engaged in trade or commerce within the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq., including the design, manufacture, advertising, marketing, promotion, distribution, and sale of cigarettes to Illinois consumers, including Plaintiff.

295. Each Plaintiff is a "person" within the meaning of the Act and purchased, used, and consumed cigarettes marketed, distributed, and sold by R.J. Reynolds and Philip Morris in Illinois.

296. In the course of trade or commerce, R.J. Reynolds and Philip Morris engaged in unfair and deceptive acts or practices by, among other things, misrepresenting, concealing, suppressing, and omitting material facts regarding the health hazards, addictiveness, design, and actual risks of the cigarettes they designed, manufactured, advertised, marketed, distributed, and sold.

297. R.J. Reynolds' and Philip Morris's deceptive acts and practices included, without limitation, representing directly or indirectly, expressly or impliedly, that:

a. smoking was not addictive;

b. smoking was not proven to cause serious disease;

c. the scientific and medical communities had not reached a consensus regarding the health consequences of smoking;

d. Defendants were undertaking honest, objective research into smoking and health and would disclose and address harmful findings; and

e. filtered, low-tar, low-nicotine, light, and ultra-light cigarettes were safer, healthier, or less hazardous than conventional cigarettes.

298. R.J. Reynolds and Philip Morris also concealed, suppressed, and omitted material facts, including but not limited to:

a. that cigarette smoking causes lung cancer, laryngeal cancer, emphysema, COPD, heart disease, and other serious illnesses;

b. that nicotine in cigarettes is addictive and that Defendants designed and maintained nicotine delivery to foster addiction and continued use;

c. that internal research and industry knowledge confirmed the carcinogenic and dangerous nature of cigarette smoke;

d. that smokers of filtered, low-tar, low-nicotine, light, and similar cigarettes would compensate in a manner that defeated any purported risk reduction; and

e. that machine-measured tar and nicotine yields did not reflect the actual doses delivered to human smokers.

299. R.J. Reynolds and Philip Morris intended that Plaintiff and consumers similarly situated rely on their deceptive statements, omissions, and

concealment in deciding whether to begin smoking, continue smoking, switch cigarette types, reduce smoking, or quit smoking.

300. R.J. Reynolds and Philip Morris' conduct was deceptive within the meaning of the Act because it involved false representations and the concealment, suppression, and omission of material facts with the intent that consumers rely on those deceptions and omissions in connection with consumer transactions.

301. R.J. Reynolds' and Philip Morris' conduct was also unfair within the meaning of the Act because it:

a. offended Illinois public policy favoring honest consumer information and protection of the public from dangerous and deceptively marketed products;

b. was immoral, unethical, oppressive, unscrupulous, and unjust in that Defendants knowingly profited from selling highly addictive and lethal products while concealing and misrepresenting material facts concerning those products; and

c. caused substantial injury to consumers, including Plaintiffs, by inducing the purchase and continued use of cigarettes under false and misleading circumstances.

302. Plaintiffs did not know, and could not reasonably have known, the full truth concerning the material facts R.J. Reynolds and Philip Morris concealed, suppressed, and omitted.

303. Plaintiffs actually relied on Defendants' deceptive course of conduct, including their public statements, omissions, denials, and misleading messaging concerning the addictiveness of nicotine, the health consequences of smoking, and the supposed reduced risks of certain cigarette designs. Plaintiffs saw or absorbed industry messaging that cigarettes were not proven harmful, not addictive, or that filtered/light products were safer.

304. As a result of R.J. Reynolds' and Philip Morris' deceptive and unfair acts and practices, Plaintiffs began smoking and/or continued smoking R.J. Reynolds' and Philip Morris' cigarettes when Plaintiffs otherwise would not have done so, would have smoked less, or would have quit earlier.

305. Had R.J. Reynolds and Philip Morris disclosed the material facts known to them, and had they not engaged in the unfair and deceptive conduct alleged herein, Plaintiffs would not have started smoking, would not have continued smoking as long, would have smoked fewer cigarettes, and/or would have switched away from cigarettes earlier, thereby reducing or avoiding their injuries.

306. As a direct and proximate result of R.J. Reynolds' and Philip Morris' violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, Plaintiffs suffered actual damages, including but not limited to financial loss, bodily injury, pain and suffering, disability, disfigurement, loss of a normal life, medical expenses, lost earnings, and other damages recognized by Illinois law.

**WHEREFORE**, Plaintiffs pray for judgment against R.J. Reynolds and Philip Morris in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00),

plus costs of suit, pre-judgment interest, attorney fees, and for any and all such other further relief as this Court deems just and appropriate.

**COUNT 8: VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1 et seq.) (Walgreens)**

307. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

308. At all relevant times, Walgreens was engaged in trade or commerce within the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq., including the advertising, marketing, merchandising, offering for sale, and sale of cigarettes and related tobacco products to Illinois consumers, including Plaintiff.

309. Each Plaintiff is a "person" within the meaning of the Act and purchased and/or consumed cigarettes sold by Walgreens in Illinois in the course of consumer transactions.

310. Walgreens committed unfair and deceptive acts or practices in the conduct of trade or commerce by, among other things, advertising, offering for sale, and selling, cigarettes to Plaintiffs and the Illinois public while possessing superior knowledge that the cigarettes it sold were defective, unreasonably dangerous, highly addictive, and substantially more harmful than reasonable consumers understood.

311. Walgreens further committed deceptive acts or practices by concealing, suppressing, and omitting material facts regarding the cigarettes it sold, including but not limited to:

a. that cigarette smoke contained thousands of chemicals, including carcinogenic, toxic, and dangerous substances;

b. that cigarettes were highly addictive because of their nicotine delivery;

c. that filtered, low-tar, light, and similar cigarette designs did not materially reduce the actual health risks to smokers;

d. that the health consequences of smoking were broader and more severe than reasonable consumers understood; and

e. that Walgreens' knowledge concerning the health risks, addictiveness, and dangerous composition of cigarettes materially exceeded the knowledge possessed by ordinary consumers, including Plaintiffs.

312. Walgreens had a duty to disclose these material facts because, among other reasons:

a. Walgreens was in a superior position of knowledge concerning the products it chose to sell;

b. Walgreens possessed and obtained information through its own health-related operations, public health materials, communications with the tobacco industry, and its own public statements;

c. Walgreens knew that consumers such as Plaintiffs would reasonably rely on Walgreens not to sell, in a pharmacy and heath

care retail setting, products whose dangers were materially greater than consumers appreciated; and

d. Walgreens chose to speak on the health consequences of smoking and the contents of cigarette smoke, thereby creating a duty not to speak half-truths or omit material qualifying information.

313. Walgreens intended that Plaintiffs and other consumers rely on its omissions, concealment, and deceptive course of conduct in deciding whether to purchase, begin using, continue using, or refrain from quitting cigarettes sold by Walgreens. Walgreens further intended that consumers would continue to purchase cigarettes from Walgreens despite not knowing the full extent of their addictiveness, chemical composition, and health risks.

314. Walgreens' conduct was deceptive within the meaning of the Act because it involved the concealment, suppression, and omission of material facts in connection with the sale of consumer goods, with the intent that consumers rely on the absence of those facts when making purchasing and usage decisions.

315. Walgreens' conduct was also unfair within the meaning of the Act because it:

a. offended public policy favoring consumer protection and public health, particularly in the retail pharmacy context;

b. was immoral, unethical, oppressive, and unscrupulous in that Walgreens sold highly addictive and lethal products while possessing superior knowledge of their dangers and while

profiting both from cigarette sales and from smoking-cessation products; and

c. caused substantial injury to consumers, including Plaintiffs, by promoting, distributing, and selling cigarettes under circumstances in which consumers lacked material information necessary to protect themselves.

316. Walgreens' unfair conduct is further shown by its decision to continue selling cigarettes notwithstanding its knowledge that cigarettes are uniquely dangerous consumer products, that other major pharmacy retailers ceased cigarette sales, and that selling cigarettes in a pharmacy setting is inconsistent with the health-protective role Walgreens holds out to the public.

317. Plaintiffs did not know, and could not reasonably have known, the full truth concerning the material facts concealed, suppressed, or omitted by Walgreens.

318. Plaintiff Alvin Bick purchased cigarettes from the Walgreens located on College Avenue in Alton, Madison County, Illinois, and was induced to do so in part by Walgreens' promotional pricing, including buy-one-get-one-free offers on cigarettes, which normalized cigarette purchasing and encouraged continued consumption.

319. Plaintiff Steven Strader purchased cigarettes from Walgreens and other drugstores and recalls seeing in-store cigarette advertisements at

Walgreens locations, which reinforced the availability and perceived acceptability of cigarettes in a heath care retail setting.

320. Plaintiff Daniel Ford purchased cigarettes from Walgreens and other drugstores and recalls seeing in-store cigarette advertisements at Walgreens locations, which reinforced the availability and perceived acceptability of cigarettes in a heath care retail setting.

321. Walgreens intended that Plaintiffs would rely on Walgreens' deceptive and unfair course of conduct, including Walgreens' failure to disclose the material facts set forth above, in purchasing, using, and/or continuing to use cigarettes sold by Walgreens.

322. Plaintiffs actually relied on Walgreens' deceptive and unfair course of conduct, including Walgreens' failure to disclose the material facts set forth above, in purchasing, using, and/or continuing to use cigarettes sold by Walgreens.

323. Had Walgreens disclosed the material facts known to it, or had Walgreens not engaged in the unfair and deceptive conduct alleged herein, Plaintiffs would not have purchased cigarettes from Walgreens, would not have begun smoking, would have smoked fewer cigarettes, and/or would have quit earlier, thereby reducing or avoiding their injuries.

324. As a direct and proximate result of Walgreens' unfair and deceptive acts and practices, Plaintiffs suffered actual damages, including but not limited to economic harm, personal injuries, pain and suffering, disability,

disfigurement, loss of a normal life, medical expenses, lost earnings, and other damages recognized by Illinois law.

325. Walgreens' violations of the Illinois Consumer Fraud and Deceptive Business Practices Act were a proximate cause of Plaintiffs' injuries and damages.

WHEREFORE, Plaintiffs prays for judgment against Defendant Walgreens in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs of suit, pre-judgment interest, attorney fees, and for any and all such other further relief as this Court deems just and appropriate.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: July 21, 2026

Respectfully submitted,

*/s/ Steven D. Davis*

Kenneth J. Brennan
Tyler J. Schneider
Steven D. Davis
TORHOERMAN LAW LLC
210 S. Main Street
Edwardsville, IL 62025
Ph: 618-656-4400
Fax: 618-656-4401
E: kbrennan@thlawyer.com
E: tyler@thlawyer.com
E: sdavis@thlawyer.com